[L. A. No. 5299. Department One.—June 5, 1920.]

WM. L. THOMPSON et al., Respondents, v. MODERN SCHOOL OF BUSINESS AND CORRESPONDENCE (a Corporation), Appellant.

[1] FRAUD—SOLICITOR FOR CORRESPONDENCE SCHOOL—ACTION FOR DAMAGES—DEFAULT IN FORMER ACTION FOR PRICE OF SCHOLARSHIPS—JUDGMENT NOT A BAR.—In an action for damages for fraud against a correspondence school by one induced to contract with it as a solicitor for scholarships, and by his wife who became surety for him, the former default of the plaintiffs in an action brought against them by the defendant for scholarships claimed to have been purchased by them, was not an adjudication of the question as to whether or not the defendant was guilty of deceit, since the question was not put in issue in that action.

[2] CONTRACT—DECEIT—REMEDIES.—Where one is induced by deceit to make a contract he may, upon discovery, repudiate and rescind the contract, or he may allow the contract to stand and perform his part thereof and may, notwithstanding such performance, recover of the other party any damages he may have suffered except in so far as his own performance may operate as a waiver of damage.

[3] ACTION FOR FRAUD—SUFFICIENCY OF EVIDENCE.—In this action for damages for fraud against a correspondence school by one induced to contract with it as a solicitor for scholarships, and by his wife who became his surety, the evidence justifies the findings that the whole scheme was founded in fraud of which the plaintiffs were made victims.

[4] ID.—RECOVERY OF ACTUAL AND EXEMPLARY DAMAGES.—In such action, the plaintiffs in view of sections 1709 and 3294 of the Civil Code could recover both actual and exemplary damages, although the compensation to be paid the solicitor was fixed by contract.

[5] ID.—EVIDENCE—SIMILAR FRAUDS.—In such action, evidence of other persons who had had similar experiences with the defendant was admissible to show *scienter* and to lay a foundation for exemplary damages.

APPEAL from a judgment of the Superior Court of San Diego County. C. N. Andrews, Judge. Affirmed.

The facts are stated in the opinion of the court.

Patterson Sprigg for Appellant.

Harrison G. Sloane for Respondents.

LAWLOR, J.—This is an appeal from a judgment in favor of the plaintiffs, William L. Thompson, and his wife, Laura P. Thompson, in an action for damages based on fraud; for actual damages to plaintiff William L. Thompson in the sum of $235, for "community damage" in the amount of two thousand five hundred dollars, and for exemplary damages in the same sum for him and his wife. The court made findings of fact and conclusions of law and entered judgment for actual damages to William L. Thompson in the amount of $230 and for joint damages in the sum of $460.

The defendant, the Modern School of Business and Correspondence, is a corporation organized under the laws of this state and claiming to have its principal place of business in San Francisco. This is the way the organization was held out to the public: It was represented in an "annual catalogue" that headquarters were maintained in a pretentious building in San Francisco, where there was a "faculty," composed of thirteen "heads of departments." Besides

CLXXXIII—8

this "faculty" there was a "superintendent of organizers," whose business, it appears, was to induce others to enter the school's employ as "field organizers." These "field organizers" were designated to solicit persons to become "students" in the school and to purchase "courses of instruction," the instruction to be given through the United States mails. It seems that, according to the scheme, the purchaser of a "course of instruction" could pay in cash or in monthly installments, and was entitled to receive from the school "syllabi, summaries, suggestive outlines, and helps in study," and upon the successful completion of the course there would be conferred upon the "student" "a handsome diploma." It was also represented in the catalogue that there was a "regular employment department to assist graduates of the school in securing desirable positions." The prices charged for the "courses of instruction" did not appear in the catalogue.

Thompson, having read in San Diego a newspaper advertisement of the school, addressed a letter to the headquarters, asking for information. The school replied under date of June 3, 1915, that if Thompson were selected he would be engaged "on a guaranteed salary, based on education and previous business experience." Thompson filled out and forwarded the application blank which had been sent to him. In a letter dated June 8th the school informed Thompson that its "superintendent of organizers," Mr. Joseph H. Hill, would call on him in San Diego, and stating, "We are authorizing him to engage you on a guaranteed salary of $900 for the first year." In the interview that followed between Hill and Thompson on June 20th in San Diego, Hill told Thompson that he would be required to make a deposit of $10, which was, according to the latter's testimony, "returnable on the first sale"; Thompson further stated that Hill told him that this deposit was "to cover the possible chance that I might not enter on the duties after he had spent his time educating me." Thompson was also required to furnish security—or, as Hill put it, a "credit blank" or "bonds"—for the faithful accounting of any collections from "students" which he might make on behalf of the school. Thompson paid the $10 deposit and "gave the name of my wife, Laura P. Thompson, as my security." Hill outlined to Thompson the

duties of a "field organizer." On June 21st Thompson entered into a written contract of employment with the school, through Hill, under the terms of which Thompson agreed to devote his entire time to the work of "field organizer" for a period of one year. The contract was admitted in evidence and the provision for compensation was as follows: "11th. If after this contract has been completed by the said party of the first part [Thompson] it be found that his profits on enrollments secured during the period of this contract, as shown by his own daily reports sent to said school have not amounted to nine hundred dollars ($900.00) then said second party [School] agrees to make up in cash such deficiency." On the same day Mrs. Thompson executed and delivered the "credit blank" or "bond" binding herself to pay to the school at *San Francisco* such amount as should be stipulated and agreed to be paid by her husband "for goods, supplies, stationery, scholarships, and certificates of membership as he may have ordered, or may hereafter order from time to time, not exceeding $250.00 in any one shipment." Thompson explained that he had his wife do this upon the representation of Hill that "it is simply a guaranty that if you collect monies for the company and you fail to return them that Mrs. Thompson, or whoever signs this letter of credit, will make restitution." Thompson further testified that on the same date Hill presented to him an "order blank" to be used in ordering courses from the school and "at the time that he produced this . . . he brought up and mentioned the samples, . . . and he then produced this blank with two courses, the Commercial Scholarship and the Civil Service Scholarship, on it. I had, of course, been studying for several days prior to this under Mr. Hill . . . and I had become very much pleased with their automobile engineering course, . . . and I told Mr. Hill that I thought I ought to have a sample of that course as well, . . . and so he said, 'All right, we will include that.' And that auto engineering course was then added. After that . . . he handed this order over to me, and I also signed this." According to Thompson, Hill also told him that these scholarships were "to be used for demonstrating the course, . . . " On cross-examination he testified further as to this conversation with Hill: "I said, '. . . these scholarships are to be paid for,

whether sold or not,' and he said 'No, that is referring to the matter of collecting the money.' "

It is alleged in the complaint, and evidence was admitted in support of the allegation that the "order blank" was changed after Thompson had signed and delivered it to Hill. As introduced in evidence there appear thereon opposite the designations "Commercial Scholarships," "Civil Service Scholarships," and "Auto Eng. Scholarships," the amounts "$27.00," "$23.00," and "$31.00," respectively; the sum "$81.00" appears as the total "amount"; opposite the words "Total amount which I am to pay for above order" is the sum "$81"; opposite the words "Total credits due me" the sum $10.00" (being apparently the deposit made by Thompson); and opposite the words "Balance to be charged to my account" the amount "$71.00." Thompson's testimony in respect to this instrument was "there were no figures on the paper at the time I signed it."

Hill did not appear at the trial, but in his deposition he testified that the "order blank" was entirely filled out, including the figures for the prices of supplies ordered, before Thompson signed it; that he never told Thompson or gave him to understand that the scholarships were for demonstrating, or were not to be paid for; that "the prices inserted in the order blank were written therein with the full knowledge and consent of the said W. L. Thompson"; and that he made no change or alteration in the figures or prices in the "order blank" after Thompson had signed it.

According to the evidence the "courses" or "scholarships" were all delivered to and accepted by Thompson, who testified that subsequently he worked faithfully for a period of eighty days trying to sell the "scholarships," but that he was unable to make a sale, and he estimated that additional expenditures incurred necessarily in the course of the canvass amounted to $28.50. About September 21, 1915, he returned to the school the three courses which he had received. The school refused to accept them and demanded that he pay the balance of $71, which, with the deposit of $10, made the total of $81. On September 29th Thompson wrote to the school declining to pay for the courses and claiming that he was not aware that they were "unreturnable." After some correspondence suit was commenced against the plaintiffs by one A. S. Cohn, assignee

of the school, in the justice's court of the city and county of San Francisco, on February 24, 1916, to recover the balance of $71. The plaintiffs herein were defendants in that action and judgment was entered against them by default. It was after the filing of the suit in the justices' court that the plaintiffs instituted this suit, alleging that the understanding between Thompson and Hill was that the scholarships were not to be paid for by *him,* but by the "students" who should buy them, and charging fraud in the insertion in the "order blank" of the figures for the price of each course or scholarship after Thompson's signature had been affixed thereto.

1. The first ground urged for a reversal of the judgment is stated in appellant's brief as follows: "That plaintiff's amended and supplemental complaint admits the adjudication in the justices' court in San Francisco of all of the subject matter herein pleaded, and by reason thereof this action is *res judicata.* . . . The defendants there and plaintiffs here had their remedy by counterclaim or any other defense, . . . " The allegation of the complaint upon which appellant bases this statement is as follows: "That thereafter and on or about the 24th day of February, 1916, defendant transferred and assigned the said instruments and purported right of action thereon . . . to one A. S. Cohn. . . . That thereafter A. S. Cohn did file an action in the justices' court of the City and County of San Francisco, California, against these plaintiffs, . . . and that the same was founded upon the instruments in writing secured from these plaintiffs, namely, the letter of credit or credit blank and the order blank above referred to; but that the same did not present for adjudication the contract of employment secured from these plaintiffs. . . . That thereafter A. S. Cohn on the 26th day of May, 1916, secured a judgment valid upon its face." [1] The answer to this contention is that the former judgment is not an adjudication of the question whether or not the defendant is guilty of deceit. The question was not put in issue in that action. [2] Where one is induced by deceit to make a contract, he has a choice of remedies: (1) He may, upon discovery of the deceit, repudiate and rescind the contract; or (2) he may allow the contract to stand and perform his part thereof, and may, notwithstanding such performance, recover of the

other party any damages he may have suffered by reason of the deceit, except in so far as his own performance may operate as a waiver of damage. Hence, it follows that a judgment against him, given upon his default, in an action brought by the other party to enforce the contract, does not preclude him from recovering damages for the deceit.

2. Appellant's second contention is that "there was no evidence of a conspiracy or scheme to extort money from plaintiffs by defendant. . . . The theory of plaintiffs' claim of damages seems to be that appellant, together with its agent, Hill, conceived a plot to entice plaintiff . . . into its employment; that the signing of the 'agreement, order blank, and credit blank,' required of respondents, was a part of the conspiracy." In this connection it is claimed that finding III is not supported by the evidence. That finding reads as follows: "That between the 30th day of May, 1915, and the 21st day of June, 1915, at San Diego, California, Jos. H. Hill as agent of said defendant solicited plaintiff William L. Thompson to enter into its employ as a field organizer in the County of San Diego, State of California. That in order to secure the consent of said plaintiff to such employment defendant made promises of payment to said plaintiff and made promises for the furnishing of certain supplies and samples and report blanks, which promises were and each of them was made by the said defendant without any intention of performing the same and with the intent to deceive the said plaintiff and to induce him to enter the employ of defendant. That except for the fraudulent statements and promises of said defendant, plaintiff would not have entered the employ of said defendant and would not have rendered the services or delivered the instruments or paid the moneys hereinafter set out."

The court further characterized in finding XI the actions of the defendant and its agent, Hill: "That all of the dealings of defendant with said plaintiffs and each of them and all the promises, representations and demands made upon them and each of them were with the premeditated purpose of defrauding each of said plaintiffs and of extorting money from each of them. That in all of such dealings, representations and demands said defendant was and is guilty of oppression, fraud and malice and that each of the said

plaintiffs suffered actual damage thereby. That the said dealings were followed by said defendant in a course of conduct generally and usually practiced by said defendant upon such persons as it succeeds in inducing to enter its employ and were in accordance with a premeditated purpose to defraud these plaintiffs. That such of the acts hereinbefore set out as were performed by defendant through its agents were performed within the scope of such agents' actual authority and were performed with the knowledge and consent of said defendant and that said defendant thereafter accepted the fruits thereof with full knowledge of all the attending circumstances.''

The Civil Code provides: ''Section 1709. One who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers.'' ''Section 1710. A deceit, within the meaning of the last section, is . . . 4. A promise, made without any intention of performing it.'' ''Section 1574. Actual fraud is always a question of fact.'' ''Section 1572. Actual fraud, within the meaning of this chapter, consists in any of the following acts, committed by a party to the contract, or with his connivance, with intent to deceive another party thereto, or to induce him to enter into the contract. . . . 4. A promise made without any intention of performing it.''

Does the evidence support the findings? There is the testimony of Thompson to the effect that, according to the representations of Hill, the ''students''—and not Thompson—would be responsible for payment of the scholarships and that no figures appeared in the ''order blank'' when Thompson signed it, in other words, that the ''order blank'' had been altered without the knowledge or consent of the plaintiff. It is clear from the evidence already referred to that the findings rest on the conclusion that the entire scheme, both in its conception and operation, was fraudulent. It is to be observed that the questions of fact whether the deposit of $10 was ''returnable on the first sale,'' whether the ''credit blank'' or ''bond'' was a guaranty of the faithful remittance of collections from the ''students'' or was merely designed further to delude the prospective victims into the belief that the transaction was *bona fide* and regular, whether Hill represented to Thomp-

son that the "scholarships" were to be paid for by Thompson or by the "students," whether the "order blank" was filled out when Thompson signed it or afterward, and whether any "courses" ordered were returnable if they remained unsold, are all involved in conflict. We must, therefore, assume that the court resolved the conflict on the side of the plaintiffs. And, in addition to the testimony already described, Paul E. Sloane and V. E. Standard testified that about the same time they had dealings of a similar nature with the school through Hill. There is a striking similarity between their testimony and that of Thompson as to the representations upon which they were induced to enter into a contract, to furnish a "credit blank" or "bond," and to sign an "order blank." Each of them also testified that the "order blank" which he had signed was subsequently filled in without his knowledge or consent, as was claimed in the case of plaintiff. The Sloane "order blank" was admitted in evidence. This showed that the figures opposite the scholarships were written in an ink of a different color from that used in writing the scholarships and in the signature of Sloane. It is significant that, according to the "credit blank," the payments were to be made in San Francisco instead of San Diego, where Thompson resided. The court, too, may have inferred fraud from the fact that on the face of the catalogue appears the cut of a prominent business building in San Francisco under which cut is printed "Home of the Modern School of Business and Correspondence, San Francisco, California, U. S. A.," in order, it would seem, to give the impression that the school occupied the entire structure. [3] Manifestly, from all the evidence the court could infer—and no doubt it did—that the whole scheme was founded in fraud of which the plaintiffs were made victims.

3. Appellant's third point is that "there was no evidence of damages, either actual or exemplary, from which plaintiffs suffered by any acts of defendant," for the reason that the compensation to be paid to Thompson was fixed by contract. [4] This is not an action on contract, but one for damages arising through fraud. We have already quoted section 1709 of the Civil Code. And section 3294 of the same code provides: "In an action for the breach of an obligation not arising from contract, where the defend-

ant has been guilty of oppression, fraud, or malice, express or implied, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant.''

4. The fourth contention of appellant is that ''the court erred in admitting the testimony of Paul E. Sloane and V. E. Standard,'' already referred to. **[5]** This testimony of independent acts was clearly responsive to the issue of fraud, first, to show *scienter,* and, second, to lay a foundation for exemplary damages. (*Kornblum* v. *Arthurs,* 154 Cal. 246, [97 Pac. 420]; *Bone* v. *Hayes,* 154 Cal. 759, [99 Pac. 172].)

5. This contention is disposed of in the discussion of appellant's second point as to the sufficiency of the evidence.

6. Appellant's sixth claim of error is ''that as to finding number 5, there was no evidence to support that portion of said finding as follows: 'Said defendant agreed to pay to plaintiff for such services the sum of nine hundred dollars, and to supply him with certain supplies, samples and report blanks.' '' This point does not call for discussion, for the reason that the eleventh clause of the contract, which we have already quoted, and the evidence in reference thereto, would alone support the finding.

Judgment affirmed.

Olney, J., and Shaw, J., concurred.