[S. F. No. 17392. In Bank. Apr. 30, 1948.]

D. H. BAGDASARIAN, Appellant, v. P. G. GRAGNON et al., Respondents.

W. M. Conley, Philip Conley, Matthew Conley, Conley, Conley & Conley and L. Kenneth Say for Appellant.

Frank C. Lerrigo and Galen McKnight for Respondents.

GIBSON, C. J.—This controversy arose out of the sale in June, 1944, of a farm by appellant Bagdasarian to respondents Gragnon for $10,000 cash, a note for $34,000 payable in installments and secured by a deed of trust on the real property, and a note for $24,000 payable on or before December 1, 1944, and secured by a crop and chattel mortgage. Respondents, after paying $14,960.15 on the note for $24,000, defaulted on the balance. Appellant brought this suit to foreclose the crop and chattel mortgage, and respondents filed a cross-complaint for damages alleging that they had been induced to purchase the farm by fraudulent representations on which they had relied to their injury. The court found for respondents on their cross-complaint and awarded them damages in the sum of $27,916.23.

Appellant's contentions may be classified under the following headings: (1) that the evidence is insufficient to support the finding of fraud; (2) that recovery is barred by waiver, estoppel and laches, and (3) that the basis of damages is erroneous and the award is unsupported by the evidence.

### Sufficiency of Evidence of Fraud

In the spring of 1944, appellant listed the property with a real estate agent whom he furnished with information concerning the kind and amount of crops grown on the land. This data was later · incorporated in a written statement which was used to induce respondents to purchase the farm. It was represented that there "is now offered $3,500 for plums and nectarines on the trees," that the 1943 crops included olives and figs which were sold for $1,100 on the trees, 600 tons of grapes, and 700 field boxes of oranges. Appellant's son, who assisted in making the sale, represented that the 1944 grape crop would yield approximately 540 tons and would be worth $45,000. Appellant never produced or identified the person whom he represented as having offered $3,500 for the plums and nectarines, and respondents sold the crop for $60. The records of the packing companies that purchased the 1943 crops showed that appellant had received only $622 for the olives and figs, and that only 252 tons of grapes and 145 boxes of oranges were produced that year. The grape crop for 1944 was less than one-third of the tonnage represented by appellant and yielded a net return of less than one-fourth the stated value. There can be no question that the representations were material, that they were false, and that they were made for the purpose of inducing respondents to purchase the farm.

The contention is made, however, that the evidence establishes as a matter of law that respondents did not rely upon the representations. The negotiations for the purchase were conducted by P. G. Gragnon, one of the respondents, who visited the farm several times before the deal was consummated and inspected the growing grape crop and the fruit trees. Gragnon was experienced in growing alfalfa, flax and cotton, but he was not a vineyardist and knew nothing about growing grapes or other fruit crops, and he testified that in making the purchase he relied on the representations of appellant and his agents.

An independent investigation or an examination of property does not preclude reliance on representations where the falsity of the statement is not apparent from an inspection, or the person making the representations has a superior knowledge, or the party relying thereon is not competent to judge the facts without expert assistance. (*Hobart* v. *Hobart Estate Co.*, 26 Cal.2d 412, 434-435 [159 P.2d 958]; *Shearer*

v. *Cooper*, 21 Cal.2d 695, 702, 704 [134 P.2d 764].) ▮ Some of the statements that were made to induce the purchase of the farm concerned the amount and value of crops produced in 1943, and there is no evidence in the record which would require a finding that the falsity of those representations was discoverable from the inspection made by Gragnon in 1944. Nor does the evidence compel a finding that the falsity of the representations concerning the value and tonnage of the 1944 grape crop was apparent from the inspection. Gragnon saw the farm in the spring, several months before the grapes reached maturity, and, in view of his lack of experience with vineyards, the court was justified in finding that the inspection did not preclude reliance on the representations concerning the tonnage and value of the grapes then growing on the land. Finally, there is no evidence that the falsity of the statement that $3,500 was being offered for the plums and nectarines then on the trees was apparent from an inspection of the crop.

While negotiations for the sale were in progress respondents asked a local bank for a report on the ranch, and after the escrow was opened, but before it was closed, respondents were informed by Mr. Elder, the bank appraiser, that in his opinion "it wasn't a very good ranch" and that he would estimate the grape crop then growing on the land "to be around 275 tons." There was evidence that this information was not received until after respondents had made a down payment of $10,000 and had gone into possession of the ranch; but even if we assume, as claimed by appellant, that the transaction was then still in an executory stage, we cannot say as a matter of law that respondents were precluded by the receipt of this information from relying on the representations made by appellant. The trial court could properly find that respondents believed appellant's estimate of the tonnage of the growing grape crop to be more nearly correct than that of Mr. Elder and that respondents were justified in their continued reliance on appellant's statements as to records of past production as well as the representations concerning the current crops.

### Defenses of Waiver, Estoppel and Laches

Appellant contends that the charge of fraud in the cross-complaint is barred by waiver, estoppel, and laches because respondents, after discovering that the representations were false, assertedly made payments on the notes, sought and re-

ceived appellant's advice and assistance in the operation of the farm, requested an extension of time for payment on the notes, and failed to make any claim of fraud until February, 1945, when the cross-complaint was filed.

█ When a party learns that he has been defrauded, he may, instead of rescinding, elect to stand on the contract and sue for damages, and in such case his continued performance of the agreement does not constitute a waiver of his action for damages. (*Paolini* v. *Sulprizio*, 201 Cal. 683, 685-687 [258 P. 380] ; *Thompson* v. *Modern School of B. & C.*, 183 Cal. 112, 117-118 [190 P. 451] ; see Prosser on Torts [1941], 775 ; 12 Cal.Jur. 782.) █ Appellant relies, however, on *Schmidt* v. *Mesmer*, 116 Cal. 267, 270-271 [48 P. 54], where the court said : ''If, after his knowledge of what he claims to have been the fraud, he elects not to rescind, but to adopt the contract and sue for damages, he must stand toward the other party at arm's length ; he must on his part comply with the terms of the contract ; *he must not ask favors of the other party*, or offer to perform the contract on conditions which he has no right to exact, and must not make any new agreement or engagement respecting it ; otherwise he waives the alleged fraud.'' [Italics added.] This language has been quoted in several California cases, and the rule has been applied to situations where, as in the Schmidt case, *the requested favors were actually granted*. (See, for example, *Tucker* v. *Beneke*, 180 Cal. 588, 594-595 [182 P. 299] ; *Schied* v. *Bodinson Mfg. Co.*, 79 Cal.App.2d 134, 143 [179 P.2d 380] ; *Howland* v. *Scott*, 117 Cal.App. 275-279 [4 P.2d 200] ; *Jackson* v. *Meinhardt*, 99 Cal.App. 283, 289 [278 P. 462] ; *Ball* v. *Warner*, 80 Cal.App. 427, 430 et seq. [251 P. 929] ; *Monahan* v. *Watson*, 61 Cal.App. 417, 420 [214 P. 1001] ; *Hough* v. *Ferguson*, 36 Cal.App. 120, 121 [171 P. 804] ; cf. *Schader* v. *White*, 173 Cal. 441, 447 [160 P. 557] ; see also 106 A.L.R. 172 et seq. ; Prosser on Torts [1941], 775-776 ; 24 Am.Jur., pp. 42-44 ; [1930] 14 Minn.L.Rev. 299-301.)

On the other hand the courts of some jurisdictions have held, in cases where favors have been extended, either that there was no waiver or that the question of intent to waive was one of fact for the jury. (*Buob* v. *Feenaughty Machinery Co.*, 191 Wash. 477 [71 P.2d 559] ; *Graham-Jones Motor Co.* v. *Nutter*, 77 Colo. 74 [234 P. 1063] ; *Bean* v. *Bickley*, 187 Iowa 689 [174 N.W. 675, 686] ; *Garrett* v. *Neitzel*, 48 Idaho 727 [285 P. 472] ; see *Timmerman* v. *Gurnsey*, 206 Iowa 35 [217 N.W. 879, 880].) In the Buob case the court said that it would

not be reasonable to suppose that a waiver resulted either from an agreement by a seller to put the article sold in proper condition or from an extension of time for payments on the buyer's notes. (Cf., 5 Williston on Contracts [rev. ed., 1937] § 1524, p. 4268, suggesting that an extension of time or change in terms of payment might not be given the effect of waiving fraud.)

There appears to be no decision in California or elsewhere which squarely holds on its facts that the mere making of an unfulfilled request alone constitutes a waiver as a matter of law. The annotator in 106 American Law Reports, pages 172, 180, states that no clear authority to this effect has been found (see also 24 Am.Jur. 44), and it has been squarely held in at least one case that the making of an ineffectual request does not constitute a waiver. (*Brustman* v. *Dunn,* 161 Wis. 306 [154 N.W. 361]; see also *Bean* v. *Bickley,* 187 Iowa 689 [174 N.W. 675, 686]; [1930] 14 Minn.L.Rev. 299, 300.) In *Burne* v. *Lee,* 156 Cal. 221, 227 [104 P. 438], the court said: ''Of course, if the mere effort to effect a rescission or compromise had both been ineffectual, it would not have disturbed plaintiff's rights to subsequently stand on the contract and sue for damages for the fraud.'' Although this may be distinguishable in principle from cases involving requests to extend time or the like, on the ground that attempts to rescind or compromise show no intent whatsoever to waive damages in the absence of a granting of the request, the Burne case is nevertheless some authority to the effect that a request may be made without running the risk of waiver, in the absence of a new agreement, provided the request is of such a nature that it indicates dissatisfaction with the original agreement.

We think it unjust and unreasonable to hold as a matter of law that the mere asking of a favor should deprive an innocent person of rights arising from an unquestionably fraudulent act, and we therefore disapprove of the language in *Schmidt* v. *Mesmer,* 116 Cal. 267, 270-271 [48 P. 54], to the extent that it indicates that the making of a request that is not complied with in itself constitutes a waiver without regard to the circumstances under which it is made.

There is serious doubt whether even a granted request of a favor, such as an extension of time, should be held to constitute a waiver in the absence of estoppel or the making of a new agreement supported by consideration, but we need not determine that question here because the facts established by the

record are not as claimed by appellant. The trial court found that the assistance and advice given by appellant with respect to the operation of the ranch were volunteered by him to protect his interest as holder of the mortgage on the crops, and that none of the other requests assertedly made by respondents was granted by appellant.

The defense of laches is based primarily upon contentions which have already been disposed of in our discussion of reliance and waiver. It is also asserted that respondents acquired knowledge of the facts in issue through the operation of the farm in 1944, but that they nevertheless made no charge of fraud until the cross-complaint was filed in February, 1945. The evidence shows, however, that the misrepresentations as to the 1943 crop were not discovered until after the foreclosure proceedings were commenced, and that the full extent of the misrepresentations as to the growing crop could not have been learned until the end of the farming year after all the crops were sold. In any event it is clear that respondents are not barred by any delay upon their part because the cross-complaint, which was filed well within the statutory period of limitations, was for damages and presented a cause of action at law and not in equity; accordingly, the defense of laches was not available. (*Brownrigg* v. *De Frees,* 196 Cal. 534, 539 [238 P. 714] ; *San Francisco Credit C. House* v. *Wells,* 196 Cal. 701, 706 [239 P. 319] ; *Smith* v. *City of Los Angeles,* 66 Cal.App.2d 562, 586 [153 P.2d 69] ; *Western Machinery Co.* v. *Graetz,* 42 Cal.App.2d 296, 300 [108 P.2d 711].)

## DAMAGES

Appellant contends, first, that in testifying relative to the value of the real property, respondents' experts erroneously used "actual value" instead of "reasonable market value" as the basis of their opinions. Section 3343 of the Civil Code provides that one who has been defrauded is entitled to recover "the difference between the actual value of that with which the defrauded person parted and the actual value of that which he received. . . ." We held in a recent case involving this section that it was proper for the court to consider market value in determining actual value. (*Herzog* v. *Capital Co.,* 27 Cal.2d 349, 354 [164 P.2d 8].) A number of decisions have construed section 1249 of the Code of Civil Procedure which prescribes that "actual value" is the measure of compensation for property condemned for a public use. In *People* v. *Ricciardi,* 23 Cal.2d 390, 401 [144 P.2d 799], it

was held that "the law has adopted market value as establishing actual value." Similarly, in *Sacramento etc. R. R. Co.* v. *Heilbron*, 156 Cal. 408, 415 [104 P. 979], the court, in answer to the contention that actual value was the only test, stated that "[t]he law universally has adopted market value as establishing actual value, and however clumsy the appellant may think the method is, it is the best one so far as known to the law." (See also *Oakland* v. *Pacific Coast Lumber & M. Co.*, 171 Cal. 392, 399, 400 [153 P. 705] [foundation of the computation "is, and necessarily must be, the market value"] ; *People* v. *Jones*, 67 Cal.App.2d 531, 537 [155 P.2d 71].)

Other cases and texts clearly show that "value," in connection with legal problems, ordinarily means market value. (See *Wade* v. *Rathbun*, 23 Cal.App.2dSupp. 758, 759 et seq. [67 P.2d 765] ; *Yellen* v. *Fidelity & Casualty Co. of N. Y.*, 115 Cal.App 434, 441 [1 P.2d 1019] ; *Bunnell* v. *Baker*, 104 Cal.App. 313, 317 [285 P. 877, 286 P. 1090] ; *Continental Rubber Wks.* v. *Bernson*, 91 Cal.App. 636, 638 [267 P. 553] ; *Dean* v. *Hawes*, 29 Cal.App. 689, 693 [157 P. 558] ; *Wickersham Co.* v. *Nichols*, 22 Cal.App. 731, 733 [136 P. 511] ; 2 Wigmore on Evidence [3d ed., 1940], § 463; 3 Wigmore, *supra*, §§ 717, 719; McCormick on Damages [1935], 165.) The Restatement, Torts, comment c to section 549, states that in deceit cases the value of an article "is normally determined by the price at which it could be resold in an open market or by private sale if its quality or other characteristics which affect its value were known." The theory is that when property is taken, or injured or destroyed by another's wrong, or not delivered pursuant to an obligation, etc., the law will protect the owner's *material* interest and award him such a sum of money as he could have obtained by selling or as would enable him to secure similar property from others. (See McCormick on Damages, *supra*, 165.) Another important reason for the rule is that real estate brokers and businessmen usually employ market value as the basic test. (See May, The Valuation of Residential Real Estate [1945], 13; McMichael's Appraising Manual [3d ed., 1944], 15.) It has also been said that although appraisers do not necessarily attempt to arrive at market value, but rather the amount that a person would be warranted in paying for the property, nevertheless market value supplies a relatively objective and easily administered basis of valuation that no other method can supply. (1 Bonbright, Valuation of Property [1937], 26, 28, 29.)

Accordingly, neither sound policy nor business custom suggest that the words "actual value" as used in section 3343 should be construed differently from the identical language in the eminent domain statutes. No California cases have been found which are contrary to this interpretation. *Zinn* v. *Ex-Cell-O Corp.*, 24 Cal.2d 290, 297 [149 P.2d 177], and *Kendrick* v. *Schwartz*, 69 Cal.App.2d 171, 175 [158 P:2d 405], involved the question of whether the value of corporate stock was to be ascertained from the worth of the corporate assets or the market price of the stock, and those cases have no bearing upon the problem raised here.

█ Although the proper and generally accepted method of establishing actual value is by evidence of market value, it does not appear that appellant was prejudiced by the ruling which permitted respondents' witnesses to testify directly as to actual value. There is nothing in the record which indicates that in forming their opinions of value, respondents' witnesses included any proscribed elements or used an erroneous basis of valuation. Moreover, the court found that the sum of $28,220.92 was both the "actual and reasonable market value." Since no improper elements of value were considered by the experts in forming their opinions, and the court treated the phrases as synonymous in its findings, appellant was not prejudiced.

█ There is no merit in appellant's contention that the farmers, farm appraisers and real estate brokers who gave expert testimony for respondents on the subject of value were not properly qualified. All of them were shown to be familiar with the value of farming land in the community, and, although some of them did not see the farm in 1944, there was evidence that it was then in substantially the same condition as at the time the appraisals were made.

█ The trial court admitted over objection a listing or card prepared in August, 1944, by respondents' witness, Arthur Barnard, a real estate broker. The card contained the date August 14, 1944, the name of D. H. Bagdasarian, a general description of the property, and the notation "Asked $90,000. Really a piece of junk—remember it as a piece of trading stock—later on." Appellant asserts that the card was not admissible as a business record under section 1953f of the Code of Civil Procedure because there was no proper foundation, because it was not relevant, and, further, because it was governed by the general rule that a party calling a witness has no right to treat as evidence a memorandum used

by the witness to refresh his recollection. (Citing 27 Cal.Jur. 91.) Appellant, however, fails to point out how the ruling, if error, was prejudicial, and in our opinion it was not. The witness had already testified that he had not listed the property for sale because in his opinion it was not worth the price asked, and subsequently he and another witness testified, as valuation experts, that the real property was worth $28,220.92, the precise figure adopted by the trial court. It is clear, therefore, that the court relied on this specific testimony rather than the general notation upon the card.

In fixing the value of the growing fruit crops, the trial court took the sum obtained from the sale of the fruit upon maturity, less respondents' costs of production and selling. It relied upon evidence of the tonnage actually produced and the price per ton for which the crops sold as the basis for an inference as to market value of the crops as a whole at the time the fraud occurred.

Market value of a growing fruit crop as of a particular date may properly be determined by considering the probable yield of the crop and its probable market price per unit when it is to be harvested and sold, less the cost of producing and marketing. (Cf. *Teller* v. *Bay & River Dredging Co.*, 151 Cal. 209, 212-214 [90 P. 942, 12 Ann.Cas. 779, 12 L.R.A. N.S. 267]; 8 Cal.Jur. 719; 15 Am.Jur. 256; McCormick on Damages [1935], p. 487; 4 Sutherland on Damages [4th ed., 1916], § 1023.) The trial court apparently sought to follow this rule, since it fixed the "actual and reasonable market value" of the growing crops by taking their market price at the time they were harvested, less respondents' costs of production and marketing.

The next question, therefore, is whether the trial court acted properly in accepting as evidence of *market* value the *actual* price per ton obtained upon sales made by respondents from the *identical* crops involved in this litigation. Market value of personal property may, of course, be established by testimony of expert witnesses, but this is not the only method, and it has been generally held that the reasonable value of marketable personal property may be shown by market prices or actual specific sales of *other similar* property, provided such sales are bona fide and not too remote in time or place. (*Betts* v. *Southern Cal. etc. Exchange,* 144 Cal. 402 [77 P. 993]; *Estate of Goodhue,* 127 Cal.App. 283 [15 P.2d 771]; *People* v. *Schwarz,* 78 Cal.App. 561, 581 [248 P. 990]; *Holman* v. *Stockton Sav. & Loan Bank,* 49 Cal.App.2d 500, 510

[122 P.2d 120]; *Estate of Spitly,* 124 Cal.App. 642 [13 P.2d 385]; see *Davis* v. *Fyfe,* 107 Cal.App. 281, 284 [290 P. 468]; 2 Witkin, Summary of Cal. Law [6th ed., 1946], 1765; McBaine, California Evidence Manual [1945], § 173, pp. 242-244; 32 C.J.S. 444-452.)

Similarly it has been held that market value of personal property may be shown by the price paid for that identical property or by the price obtained for it at a subsequent sale. (*Moore* v. *Maryland Casualty Co.,* 100 Cal.App. 658 [280 P. 1008]; *Tatone* v. *Chin Bing,* 12 Cal.App.2d 543 [55 P.2d 933]; *Mattechek* v. *Pugh,* 153 Ore. 1 [55 P.2d 730, 734]; see *Yukon River etc. Co.* v. *Gratto,* 136 Cal. 538, 541 [69 P. 252]; 4 Sedgwick on Damages [9th ed., 1913], pp. 2638-2639.) In *Moore* v. *Maryland Casualty Co.,* 100 Cal.App. 658 [280 P. 1008], the only evidence of the value of a crop of growing grapes which had been converted consisted of shipping statements showing that actual sales of grapes from the crop brought a net market price of over 50 cents per box, and the court held (p. 668) : ''In the absence of evidence to the contrary, the price which a portion of the same variety and crop of grapes actually brought in that market at the time of the conversion, furnishes ample proof of the reasonable market value thereof.''

It must be recognized that in California a line of decisions has held the value of *real* property may not be proved by evidence of particular sales of *other similar* real property. (See, for example, *Estate of Ross,* 171 Cal. 64 [151 P. 1138], and cases there cited.) This is the minority view in the United States, and it has been severely criticized. See 118 A.L.R. 869-914; 32 C.J.S. 444 et seq.; 2 Wigmore on Evidence [3d ed., 1940], § 463, p. 503 et seq.) Although this court has recently held that a party in an eminent domain proceeding may not put in evidence the amount paid by a *condemning party* to the owners of similar adjacent lands (*City of Los Angeles* v. *Cole,* 28 Cal.2d 509 [170 P.2d 928]; *Heimann* v. *City of Los Angeles,* 30 Cal.2d 746 [185 P.2d 597]), these decisions do not necessarily constitute a reiteration of the general rule of absolute exclusion, since a sale to a condemning party may be affected by factors not present in an ordinary private sale. As appears from the annotation in 118 American Law Reports at page 893, the Cole and Heimann cases are in accord with the weight of authority in holding that evidence of this particular type of sale is not admissible to prove value.

In any event, as is apparent from the cases involving personal property which we have cited above, the exclusionary rule of the real property decisions has not been applied to personalty. There is some basis for the distinction, since, historically, parcels of real property have always been treated as unique and not similar to other parcels of realty. As stated in McCormick on Damages [1935], page 177: "In case of ordinary personal property, where market value is sought, of course the most obvious resort is to evidence of what other similar property, whether wheat, shoes, horses, or what not, currently sold for on the market at that place. . . . Where the property is not of a standardized sort, such as a pedigreed bull or a Rembrandt etching, one encounters difficulties as to whether any other like article sold was sufficiently similar for its price to be indicative. Any tract of land is unique, unless we except vacant lots in a subdivision, and consequently it is in cases of land valuation, and especially in condemnation cases, that the question of admissibility of evidence of prices paid on sales of other land is most frequently discussed." This reasoning is particularly applicable to cases like the present one where the evidence consists of the price obtained at a sale of the *identical* property in question, because in such a situation the only problem as to similarity arises from the possibility that the character or value of the property may have changed between the time of the sale and the time as of which it is to be valued.

In *Thompson* v. *Stoakes*, 46 Cal.App.2d 285, 293 [115 P.2d 830], a case involving real property, it was held, however, without discussion or analysis, that "the rule is well-settled in this state that on the direct examination of witnesses called to testify as to value, they cannot be permitted to testify as to particular transactions such as sales of similar or the same property" and that the cases applied the rule "to sales of the very property the value of which is in issue." A similar statement was made by way of dictum in *Keating* v. *Basich Bros. etc. Co.*, 66 Cal.App.2d 258, 262 [151 P.2d 892]. But an examination of the authorities there cited shows that, with the possible exception of the Ramish case, 90 Cal. 581 [27 P. 433], discussed later, they did not relate to *actual* sales of the *identical* real property, but rather that they pertained either to *offers* to buy or sell the property in question or to sales of *other* similar property. (See *Estate of Ross*, 171 Cal. 64 [151 P. 1138]; *Central Pac. R. R. Co.* v. *Pearson*, 35 Cal. 247;

*Merchants Trust Co.* v. *Hopkins,* 103 Cal.App. 473 [284 P. 1072] ; 10 Cal.Jur. 1027.) Moreover, authorities elsewhere are practically unanimous in holding that evidence of other sales of the identical real property is admissible. (See cases collected in 155 A.L.R. 262-278 ; cf., Orgel on Valuation [1936], 454-455.) There is no reason for extending the much-criticized exclusionary rule to evidence of sales of the *identical* property in question, whether realty or personalty, and, accordingly, the Thompson and Keating cases must be disapproved.

In *Ramish* v. *Kirschbraun & Sons,* 90 Cal. 581 [27 P. 433], it was held that a contract by a buyer of eggs to sell them to third persons was incompetent to establish the market value of the eggs. The court, however, may have believed that an incorrect standard of recovery had been followed by the trial court, since the opinion states (p. 582) that the ''evidence should have been confined to the inquiry, 'What was the *market value* of eggs between July 8th and July 14th?' '' No authority or reason was given for the broad statement that the price agreed on between the buyer and other persons not connected with the sellers was incompetent to establish the market value of the eggs or the liability of the sellers, and this language should not be followed here inasmuch as it is inconsistent with all of the cases dealing with personal property.

It is claimed that the price actually obtained is not sufficient evidence of value because respondents may not have followed proper marketing practices. Similarly it is urged that the trial court should not have accepted the actual tonnage produced by respondents as evidence of the yield which could reasonably have been expected at the time the fraud occurred, because certain factors, such as unfavorable weather and poor farming practices, could have resulted in a lower yield. Appellant's contention is that, in arriving at value, the court should have accepted the estimates of the probable yield of the grape crop made by his experts as of the date of the fraud instead of taking respondents' testimony of tonnage actually produced.

Evidence of the estimated yield which should have been produced was, of course, admissible, but it was not conclusive, and the court properly took into consideration respondents' evidence of the tonnage produced and the price per ton for which it sold as the basis of an inference of market value of the crop as a whole at the time the fraud occurred. The matters urged by appellant to show that this evidence

was untrustworthy go merely to the weight of the evidence and, under the circumstances of this case, do not compel its rejection.

Appellant claims that the alfalfa crop was purchased together with the other growing crops but that the finding of the trial court erroneously failed to include the value of the alfalfa in determining the value of all the growing crops purchased. Respondent P. G. Gragnon testified, however, that the purchase of the crops did not include the alfalfa, and appellant admits that the alfalfa was specifically excluded as a crop from the crop and chattel mortgage. It is apparent that the alfalfa was purchased as a part of the real property and that its value was included in the testimony and findings relating to the value of the realty.

The trial court found that respondents suffered damages amounting to $27,916.23 because of the fraud—$15,779.08 with respect to the real property and $12,137.15 as to the growing crops. It is not claimed that any misrepresentations were made concerning the farm equipment, and the court in fixing the amount of damages did not take into consideration the purchase price and the reasonable market value of the equipment at the time of the transfer, although the uncontradicted evidence shows that it was reasonably worth more than respondents paid for it. Appellant contends that the damages should be reduced by the amount of such excess, arguing that under section 3343 of the Civil Code damages for fraud are limited to "out-of-pocket" loss. ▮▮▮ Section 3343, enacted in 1935, provides: "One defrauded in the purchase, sale or exchange of property is entitled to recover the difference between the actual value of that with which the defrauded person parted and the actual value of that which he received, together with any additional damage arising from the particular transaction. Nothing herein contained shall be deemed to deny to any person having a cause of action for fraud or deceit any legal or equitable remedies to which such person may be entitled." The measure of damages set forth in the statute, referred to as the out-of-pocket loss rule, has been followed in England, the federal courts, and a few states. (See McCormick on Damages [1935], 448-454; 24 Am.Jur. 58-62; [1939] 13 So.Cal.L.Rev. 168-170.) It has also been accepted by the Restatement as the preferable rule. (Rest., Torts, § 549.)

It is suggested, however, that section 3343 was intended only as a permissive or alternative measure of damages and

that the trial court could properly permit recovery of the difference between the actual value of what the defrauded person received and the value which it would have had if it had been as represented. This measure of recovery, known as the "benefit-of-the-bargain" rule, is followed in a majority of the states. (See McCormick on Damages [1935], 448-454; 24 Am.Jur. 55-58.)

It has been said, however: "In few of the states have the courts seized upon one of these formulas and applied it with entire consistency in all classes of cases." (McCormick, op.cit. *supra*, 452; see, also, 24 Am.Jur. 60-62.) This statement is applicable to the cases in California which were decided before the adoption of section 3343 of the Civil Code. Although it was generally stated that California applied the benefit-of-the-bargain rule (see *Davis* v. *Rite-Lite Sales Co.*, 8 Cal.2d 675, 679 [67 P.2d 1039]; *Wood* v. *Niemeyer*, 185 Cal. 526, 532 [197 P. 795]; *Hines* v. *Brode*, 168 Cal. 507, 510 [143 P. 729]; 25 Cal.Jur. 563), it is apparent that there was considerable confusion and that the rule was not always followed. (Cf. *Crystal Pier Amusement Co.* v. *Cannan*, 219 Cal. 184, 192 [25 P.2d 839, 91 A.L.R. 1357]; *Divani* v. *Donovan*, 214 Cal. 447, 454 [6 P.2d 247]; *MacDonald* v. *Roeth*, 179 Cal. 194, 200 et seq. [176 P. 38]; *Cross* v. *Bouck*, 175 Cal. 253, 257 [165 P. 702] [explained on denial of hearing by Supreme Court in *George Cople Co.* v. *Hindes*, 34 Cal.App. 576, 580 [170 P. 155]]); *Hines* v. *Brode*, 168 Cal. 507, 510 [143 P. 729]; *Garstang* v. *Skinner*, 165 Cal. 721, 726 [134 P. 329]; *Barbour* v. *Flick*, 126 Cal. 628, 633 [59 P. 122]; [1934] 22 Cal.L.Rev. 456, 457; [1939] 13 So.Cal.L.Rev. 168, 169.)

Since the enactment of section 3343, however, all the California cases have either held or assumed that the statute prescribed the measure of damages to be applied in fraud cases. *Jacobs* v. *Levin*, 58 Cal.App.2d Supp. 913 [137 P.2d 500], is directly in point. It was there held that in view of the enactment of section 3343 the plaintiff could not recover on the theory that the house he had purchased from defendants was worth less than the value it would have had if, as defendants had impliedly represented, it had contained a usable fireplace. The court noted the arguments for and against both rules and stated (at p. 916): "Neither rule has proved altogether satisfactory and as a result the law has fluctuated from time to time in some of the states (24 Am.Jur. p. 60). After considering the merits of the two rules the American Law Institute in its Restatement of the Law of Torts adopted

the federal or 'out-of-pocket' loss rule. (Rest., § 549.)'' The court then concluded that by the enactment of section 3343 the out-of-pocket loss rule was substituted for the loss-of-the-bargain rule in California.

In *Rothstein* v. *Janss Investment Corp.*, 45 Cal.App.2d 64, 73 [113 P.2d 465], it was said: ''Since the cause must be remanded for a trial of the issues, it may be well to call attention to the present rule as to damages in such cases as embodied in the provisions of section 3343 of the Civil Code, added by Statutes of 1935. . . . The measure of damages thus set forth is the difference between the consideration paid for the property and the actual value of the property, with additional damage, if any. This would appear to abrogate the former rule as set forth in *Rogaff* v. *Bartles* (1931), 115 Cal. App. 429 [1 P.2d 517], and cases there cited, wherein it was held that the measure of damages was the difference between the actual value of the property and the value it would have had if the representations had been true.''

In *Shonts* v. *Hirliman*, 28 F.Supp. 478, 481-482, it was stated that the rule permitting recovery on the basis of value of the property if it had been as represented ''was abolished in California by the Amendment of 1935 to Section 3343 of the Civil Code.''

*Feckenscher* v. *Gamble*, 12 Cal.2d 482 [85 P.2d 885], was an action for damages for fraud arising from false representations of value made by defendants during the course of a transaction by which plaintiff and defendants exchanged certain properties. Section 3343 of the Civil Code became effective after the accrual of the cause of action but before the trial. The trial court, however, allowed recovery in the sum of $17,760, representing the difference between the ''actual value'' of the property which plaintiff received and ''the valuation . . . as represented.'' (12 Cal.2d at p. 499.) On appeal, in sustaining defendants' objection that the correct measure of damages was not applied, this court declared that after ''the completion of the transaction and before the trial of the case, the measure of damages was changed by the Legislature by an amendment and the new measure was in effect at the date of the trial'' and, further, that section 3343 governed even though it was not the measure of damages in existence at the time of the accrual of the cause of action. (12 Cal.2d at pp. 499-500.) The opinion states that the reasonable value of the property parted with by plaintiff was $13,700, that she actually received nothing of value from the trans-

action, and, accordingly, that the judgment should be modified by reducing the amount of recovery from $17,760 to $13,700. Thus, it was squarely held that, after the enactment of section 3343, a person who has been defrauded may no longer recover the difference between the actual value of the property received and the value it was represented to have.

A number of other cases have applied section 3343 without any discussion of the problem. (*Herzog* v. *Capital Co.*, 27 Cal.2d 349, 354 [164 P.2d 8]; *Schied* v. *Bodinson Mfg. Co.*, 79 Cal.App.2d 134, 145 [179 P.2d 380]; *Kendrick* v. *Schwartz*, 69 Cal.App.2d 171, 175 [158 P.2d 405]; *Macart* v. *San Joaquin B. & L. Assn.*, 45 Cal.App.2d 395, 400 [114 P.2d 395]; *Mortimer* v. *Young*, 37 Cal.App.2d 164, 168 [98 P.2d 1061]; see *Zinn* v. *Ex-Cell-O Corp.*, 24 Cal.2d 290, 297 [149 P.2d 177]; *Taylor* v. *Wright*, 69 Cal.App.2d 371, 385-386 [159 P.2d 980]; *Martin* v. *Tully*, 44 Cal.App.2d 226, 234 [112 P.2d 282].) We have been able to find no case, however, which has applied the benefit-of-the-bargain rule after section 3343 became operative. *Davis* v. *Rite-Lite Sales Co.*, 8 Cal.2d 675 [67 P.2d 1039], is apparently the last decision stating the former rule to be a proper measure of damages. The judgment in that case was rendered May 6, 1935, before section 3343 became effective, and the opinion made no reference to the statute.

In view of the broad, general language of section 3343 of the Civil Code and the uncertainty in the law that existed both here and elsewhere prior to the adoption of that section, it is reasonable to conclude that the statute was enacted to provide a uniform rule for all fraud cases, and we can see no reason for refusing to follow the decisions which have applied it as the exclusive measure of damages. Moreover, to hold that an additional or alternative measure may be applied in some cases would create further confusion with respect to when the alternative measure would be appropriate in place of the statutory measure and whether the matter would be one for the judge, as a matter of law, or for the jury.

The provisions of section 3343 to the effect that the defrauded person may also recover any "additional damage" arising from the particular transaction and that nothing in the statute shall be deemed to deny to such a person "any legal or equitable remedies" to which he may be entitled, do not indicate that any other *measure of damages* may be applied. The right to recover *additional* damages does not refer to the *measure* of damages, but, rather, to such matters as

expenses or other consequential injury resulting from the fraud. (See *Jacobs* v. *Levin,* 58 Cal.App.2d Supp. 913, 917 [137 P.2d 500]; see, also, Rest., Torts, § 549, which also permits such additional recovery.) The provision relating to other legal or equitable *remedies* likewise does not pertain to measure of damages, but, rather, it preserves such other remedies as the right to rescind or the right to recover on a warranty, if any. (See *Jacobs* v. *Levin, supra,* at p. 918.) The construction which has been placed on section 3343 does not preclude the allowance of exemplary damages. (Civ. Code, § 3357; *Taylor* v. *Wright,* 69 Cal.App.2d 371, 386 [159 P.2d 980].)

In the present case it is clear, therefore, that the trial court could properly award only out-of-pocket loss in fixing respondents' damages. ■ The purchase of the farm equipment could be disregarded in determining the amount of damages only if the transaction was entirely separate and distinct from the purchase of the farm and the crops. The court, however, found in accordance with the allegations of the cross-complaint that "the purchase of said real property, personal property, farm equipment and crops . . . arose out of and were a part of the same transaction." (See Civ. Code, § 1642; *Goodspeed* v. *Great Western Power Co.,* 33 Cal.App.2d 245, 265 et seq. [91 P.2d 623, 92 P.2d 410].) Since the items of the transaction were not severable, the sum paid for the farm equipment must be included as a part of the total consideration given by respondents and the actual value of the farm equipment must be included as a part of the value of the property received by respondents. The purchase price of the farm equipment was $1,500. Respondents' witness testified that its value as of June, 1944, was $2,404.75, and appellant testified that its value as of that date was approximately $7,000. No finding was made, however, as to the value of this property, and the failure to determine the amount and to include it in computing the value of the property received constituted prejudicial error.

The judgment provides that the balance due on the note for $24,000 secured by the crop mortgage be set off against the damages for fraud; that the note be thereby paid and discharged; and that the balance of the damages for fraud be credited upon and set off against the first payments of the principal and interest due and to become due on the note for $34,000 secured by the deed of trust on the real property. Appellant complains because the damages are set off against

the first payments to become due on the real property note instead of against the last payments. It is clear, however, that the award of damages on the cross-complaint was payable immediately, whereas under the terms of the note appellant had an immediate right only to such payments as had then become due. ■ Although he was entitled to a set-off with respect to the matured payments, he had no right to a set-off as to payments that were not yet due. (Code Civ. Proc., §§ 438, 440; see 23 Cal.Jur. 232; 47 Am.Jur. 738.) The set-off with respect to the real property note was made by the court at the request of the appellant, and he cannot complain if the court in seeking to do equity gave him a greater advantage than he may have been legally entitled to receive.

The failure to find the value of the farm equipment and make the proper allowance therefor in awarding damages requires a new trial for the limited purpose of ascertaining the value of such equipment.

That portion of the judgment appealed from is reversed, and the cause is remanded with directions (1) to ascertain the value of the farm equipment as of the date of sale; (2) to add the amount of that value to $38,583.77, the value of the real property and the crops as found by the trial court; (3) to deduct that total from $68,000, the price paid for the real property, crops, and equipment; (4) to adjudge that respondents are entitled on their cross-complaint to damages in the amount of the difference between the price paid and the total value of the real property, crops, and equipment; and (5) to allow the amount of the damages as so computed to be set off in the manner provided in the judgment appealed from, the set-off to be effective as of January 4, 1946, the date of rendition of that judgment. The parties shall bear their own costs on appeal.

Shenk, J., Edmonds, J., Carter, J., Traynor, J., and Spence, J., concurred.

SCHAUER, J.—I dissent.

I do not agree that the out-of-pocket loss rule is preferable to the benefit-of-the-bargain rule as a measure of damages in fraud-sale cases; nor do I agree that we are bound to hold that the purpose of enacting section 3343 (of the Civil Code) in 1935 was to substitute the out-of-pocket loss measure of damages for fraud in place of the former benefit-of-the-bargain rule.

The statute as enacted specifically declares that "Nothing herein contained shall be deemed to deny to any person having a cause of action for fraud or deceit any legal or equitable remedies to which such person may be entitled." As I read the whole enactment, in the light of the language above quoted and the history of the bill in this state and similar measures elsewhere, we could justifiably hold that the purpose of the Legislature was not *prohibitively to substitute* the "out-of-pocket" rule for the "benefit-of-the-bargain" rule but, rather, *permissively to provide* an additional or alternative remedy or measure of damages which might be applied in proper cases.

It seems reasonable to me to believe that the Legislature had purposed giving the defrauded victim greater protection; but the construction given the act by the majority opinion turns it into an act to protect the perpetrator rather than the victim of the fraud. As pointed out by Professor Williston, under the rule now adopted by the majority "a fraudulent person can in no event lose anything by his fraud. He runs the chance of making a profit if he successfully carries out his plan and is not afterwards brought to account for it; and if he is brought to account, he at least will lose nothing by his misconduct." (5 Williston on Contracts (rev. ed.), § 1392, p. 3886.)

It is quite conceivable that a buyer might purchase property solely because it was represented to possess a certain quality; the presence or absence of that quality in one case might substantially affect, and in another not affect at all, the market value of the property. In one case the "benefit-of-the-bargain" rule might alone afford an adequate and just remedy; in the other case the circumstances could well be such that only the "out-of-pocket" rule would accomplish a substantial recovery. Under the majority opinion rule the fraudulent misrepresentation is wholly immaterial on the question of the amount of damages; and a fraudulently induced purchase contract entered into under our system of free enterprise, of course for profit, and which would produce a profit if the fraudulent misrepresentations were true, affords no basis whatsoever for the recovery of damages on account of the falsity of the representations and the consequent failure of the contract to produce a profit. If the property purchased is worth barely the contract price, no recovery of damages can be had; the loss of the legitimately contemplated profit of

the entrepreneur must be borne wholly by the victim, not at all by the perpetrator, of the fraud; if the property is worth less than the contract price, the worst that can happen to the fraud perpetrator is that he may be restored to his former estate; i.e., he may be deprived of his fraudulent profit, but of no more. The innocent victim, however, as noted, is deprived of his legitimately contemplated profit.

I recognize that in a number of cases decided in this jurisdiction since the 1935 statute was enacted it has been tacitly assumed that the new legislation stated the exclusive measure of damages in fraud-sale cases; but in the absence of discussion pointed directly at this question, and considered determination thereof, I do not believe that we should now regard it as closed.

In my view the trial court's findings are predicated on a proper theory of recovery (the benefit-of-the-bargain rule) and are supported by sufficient evidence. Accordingly, I would affirm the judgment.

Appellant and respondents' petitions for a rehearing were denied May 27, 1948, and opinion and judgment were modified to read as above. Schauer, J., voted for a rehearing.