Filed 8/8/13  Hackbart v. Uppal CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| DAVID HACKBART et al., | D059657 |
| Plaintiffs and Appellants, | |
| v. | (Super. Ct. No. GIN057896) |
| SATINDER M. UPPAL et al., | |
| Defendants and Appellants; | |
| BHAVNA R. UPPAL, | |
| Defendant and Respondent. | |

APPEALS from a judgment of the Superior Court of San Diego County, Thomas P. Nugent and Earl H. Maas III, Judges.  Affirmed in part, reversed in part.

English & Gloven, Donald A. English, Jeffrey E. Flynn; Boudreau Williams, Jon R. Williams, for Plaintiffs and Appellants, David Hackbart and Kihack Management, LLC.

Catanese & Wells, Thomas Randolph Catanese, Douglas R. Hume; Gerald N. Shelley, for Defendant and Appellant, Satinder M. Uppal and Defendant and Respondent, Bhavna R. Uppal.

Catanzarite Law Corporation, Kenneth J. Catanzarite and Nicole M. Catanzarite-Woodward, for Defendant and Appellant, Suresh K. Soni.

Defendants and appellants Satinder M. Uppal and Suresh K. Soni appeal from a judgment entered after a bifurcated jury and bench trial on fraud and related equitable claims of plaintiffs and respondents David Hackbart and Kihack Management LLC (collectively Hackbart) arising out of Hackbart's purchase of a gasoline station and related businesses from defendants. The trial court entered a judgment awarding Hackbart $1,400,000 in fraud damages and $700,000 in punitive damages against Uppal, and $232,000 against Soni in the amount it found Soni had been unjustly enriched. It awarded $1,400,000 in breach of contract and fraud damages against suspended corporation MTPA Ventures Limited, Inc. (MTPA), against which it had previously entered a default judgment. The court declined to hold any of the individual defendants liable for the acts of MTPA as alter egos.

Uppal contends: (1) there is no evidence to support the jury's finding that Hackbart justifiably relied on any statement or concealment of fact; and (2) the court erred by permitting the jury to calculate fraud damages in a manner contrary to the Civil Code[1] section 3343 out-of-pocket measure. Soni joins these arguments from Uppal's appellant's brief. Uppal separately contends the jury's punitive damage award is unsupported by a finding of actual damage, excessive and contrary to law. Soni

---

[1]     Further statutory references are to the Civil Code.

2

separately contends the trial court erred by finding he was unjustly enriched because Hackbart had no legal basis on which to premise a claim for unjust enrichment, and even if there were such a basis, Hackbart failed to proffer evidence of the businesses' value at the date of sale.

Hackbart cross-appeals, contending the restitutionary award against Soni was improperly limited to the net cash proceeds Soni received, and should be increased to $560,000, which reflects Soni's proportionate share of the gross out-of-pocket damages awarded to Hackbart. Hackbart further contends the trial court erred by denying alter ego liability against Soni.

We conclude that to the extent the trial court erred by submitting the wrong measure of fraud damages to the jury or the jury calculated fraud damages in a manner contrary to section 3343, the error was invited by Uppal's submission of the fraud damages jury instruction. We reverse the restitution award against Soni as unsupported by an independent basis for liability, as well as the punitive damages award against Uppal as without support by meaningful evidence of his ability to pay. We reject the remaining contentions and otherwise affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

In 2001, Uppal, a certified public accountant (CPA) with undergraduate and master's degrees from University of Southern California in business administration and business taxation, purchased out of bankruptcy a Chevron gasoline station and related businesses located at 350 Encinitas Boulevard. The purchase price was $1.1 million. Uppal signed the purchase agreement and promissory note, as well as the security

3

agreement and a sublease. During the previous 13 years, he had invested in 12 to 15 automotive-related franchises and desired to get out of that business. At some point, he and Soni agreed to be financial partners in the transaction, and they formed and incorporated MTPA in September 2001, shortly before the purchase. Uppal and his wife Bhavna Uppal owned a 60 percent interest in MTPA, and Soni owned a 40 percent interest. Despite MTPA's creation, Uppal never attempted to assign to MTPA any assets or rights to the business he had individually acquired, assertedly because the bankruptcy court would not permit it. Soni accepted that all of the assets were in Uppal's name.[2]

MTPA never held any formal shareholder or board of director meetings. MTPA did, however, obtain a seller's permit from the state Board of Equalization in order to collect sales tax, and Uppal was responsible for doing the monthly reporting of sales and use taxes due. From January 2004 to August 2004, Uppal understated transactions at the Chevron station subject to gasoline sales taxes so he could save money, even though he knew doing so was dishonest.

---

[2] For clarity and not out of disrespect, we refer to Satinder Uppal as Uppal, and his wife Bhavna Uppal as Bhavna. Uppal listed his wife Bhavna as the president, secretary and treasurer of MTPA, and she and Soni were its sole directors. MTPA was incorporated as a domestic stock corporation on or about September 14, 2001. Its corporate filings identified all of its officers as Bhavna Uppal in her maiden name. Uppal signed his wife's name with her authorization on various documents, including the Chevron station's state, local and district sales and use tax returns from January 2004 through August 2004.

At some point in 2004, Uppal shared with Soni a monthly "break-even" analysis of the station's profits and losses from 2003 that showed losses for 11 of the 12 months of that year, a net loss of over $91,000.[3] The men exchanged e-mails and discussed whether it made sense to put more money into the business given that analysis. Soni told Uppal that his numbers did not make sense to him, and he asked him to come up with a "clean set of numbers"; that they would discuss the sale "once we clean the books." The men decided they would sell the business and started marketing it by the spring of 2004.

In October 2004, Hackbart, a car wash owner with a college degree in accounting, called Uppal in response to an advertisement about the Chevron station. Uppal informed Hackbart of the nature of the business including the volume of gas pumped per month and the profit per gallon, and the revenues from both the car wash and convenience store. Uppal told him the average income from January 2004 to August 2004 was $33,000 to $34,000. A few days later, Hackbart made an e-mail offer to Uppal of $1.8 million for the business, contingent on an inspection of its books and records. Uppal countered with a higher offer that would permit Hackbart to inspect the books and records within the next three days. They finally settled on a purchase price of $1.875 million for the Chevron gas station, car wash, convenience store, automobile repair center and the rights to a sandwich franchise.

---

[3] The statement reported a $9,000 loss in January 2003 and other losses of $10,000 or more for other months. The only positive month was July 2003, which showed a $31 profit. According to MTPA's income statement, the business had a $61,000 loss in the first six weeks of opening, $7,000 net income in 2002, and $46,000 net income in 2003. The latter income statement was inconsistent with the break-even analysis reviewed by Uppal and Soni, but neither Uppal nor Soni gave the break-even analysis to Hackbart.

In late October 2004, Uppal, Hackbart and other potential investors with Hackbart met at a nearby restaurant and Hackbart was shown profit and loss statements as well as "Excel" spreadsheets for eight months ending in 2004, showing a net operating income of about $33,000 to $34,000 per month. Uppal also showed Hackbart tax statements from 2003 showing ordinary income of $46,632. Uppal did not show Hackbart the 2003 break-even analysis showing $91,000 in losses. Uppal explained to Hackbart how the net operating income had continued to grow from the time Uppal had taken the business out of bankruptcy. That day, Uppal permitted Hackbart to take the profit and loss statement and spreadsheets, and though Hackbart was still interested in going forward, he sought more documentation. Later, in response to Hackbart's e-mail request, Uppal additionally provided, among other documents, an August 2004 invoice showing gas purchases. Hackbart continued to ask Uppal for additional documents including financial statements he had been shown but was not permitted to take as well as bank statements; Uppal told him they were in numerous boxes with his CPA due to a recent move. In another telephone call, Hackbart asked Uppal to break down the sales components of each part of the business in detail, and Uppal did so over the phone while Hackbart took detailed notes concerning the net revenues for an eight-month period ending August 31, 2004. Hackbart did not see anything surprising in Uppal's numbers, and based on all of Uppal's statements, he became convinced they were the actual numbers for the business. The next day, while Hackbart and Uppal negotiated the purchase price and terms, Hackbart again asked for documents to back up the numbers, but Uppal reiterated that they were

6

not available.  Uppal urged Hackbart to waive the contingency provision on reviewing books and records, and Hackbart did so.

In November 2004, Hackbart signed a purchase and asset sale agreement (the purchase agreement) with MTPA.  He agreed to pay $1,875,000 for the gas station, car wash, convenience store, related office space, and the rights to the sandwich franchise in the form of $1,075,000 in cash and Hackbart's assumption of an existing $800,000 promissory note against the business.  In the purchase agreement, Hackbart acknowledged he had "reviewed the books and records prepared by Seller of Chevron in Encinitas," was "satisfied with those records and hereby removes the contingency in paragraph 3 of the purchase and sales agreement . . . ."  When Hackbart received the escrow instructions, however, he took the time to alter or strike out several paragraphs in them.  First, because he had not received all of the books and records that he had requested and had primarily relied on Uppal's representations as to the business's financial statements and revenues, he struck out and initialed a sentence stating he had not relied upon seller representations but had conducted his own investigation.  He also struck out a paragraph entitled "Purchase Agreement Governs," which indicated in part that the parties had agreed the escrow instructions "supersede and void" any prior agreements.  Hackbart felt that Uppal had in fact made representations to him.

In May 2005, Hackbart signed final escrow instructions containing a statement that the parties agreed "all warranties and representations of the parties shall survive the closing of this escrow."  The statement was important to Hackbart because his understanding of the businesses' numbers came from Uppal and he did not have the back-

7

up documents he had asked for. During the entire transaction, Uppal did not tell Hackbart about the underreporting of sales tax or that Uppal had underestimated the businesses' expenses, was behind on lease payments, had to borrow on personal credit cards to fund business expenses, or that the business required loans to meet expenses. Soni never told Hackbart that he suspected the books were inaccurate or otherwise tried to share any information concerning what he knew about the business. Escrow closed on or about May 3, 2005.

After Hackbart took over the businesses, he observed he was losing money; expenses were much higher than expected. When he figured the profits and losses for the first 10 to 11 months of operation, he calculated a net loss of almost $24,000. In order to run the businesses, Hackbart had to slash expenses, and had his wife work there five or six days a week without pay. In the first few months, he paid sales taxes from his personal funds. Hackbart eventually retained Brian Bergmark, a forensic accountant and CPA who had previously valued gas stations for various estate and litigation matters, to conduct an analysis of the businesses' financial performance.

In December 2006, Hackbart sued MTPA, Uppal, Bhavna, and Soni for rescission and restitution, fraud, breach of contract, "unjust enrichment," an accounting and imposition of a constructive trust. He later filed a first amended complaint, which defendants answered, generally denying the allegations and asserting various affirmative defenses.

8

The case proceeded to a bifurcated jury trial on Hackbart's claims for intentional and negligent misrepresentation as well as fraud by concealment. MTPA had not appeared and, before trial, the trial court entered its default, striking its answer and operative cross-complaint. The trial court and Hackbart's counsel characterized the proceeding as to MTPA as a "prove-up on damages." Hackbart dismissed without prejudice his first cause of action.[4]

At trial, Hackbart's expert, Bergmark, opined that Hackbart had suffered economic damages in connection with his purchase of the businesses. He derived these damages by calculating an "indicated value" using an adjusted earnings (earnings before interest) analysis, and applying the multiple that Hackbart was willing to pay (based on the $1,875,000 purchase price relative to the earnings reported by Uppal), under two different scenarios. In reaching his conclusions, Bergmark annualized Uppal's underreported sales tax, explaining he considered these numbers because if business earnings were overstated, a person would overpay for what he or she received. According to Bergmark, accounting for Uppal's underpaid sales tax, Hackbart overpaid

---

[4]     Before trial, Hackbart's counsel stated:  "We have and will be dismissing the first cause of action for rescission.  We have sent someone downstairs to file that one dismissal, that one cause of action"  The court clerk responded that it had been done, and the trial court acknowledged the cause of action was not reflected in the verdict form. Hackbart's counsel reiterated that the "first cause of action for rescission is being dismissed without prejudice."  Hackbart later claimed, and the trial court agreed, he did not dismiss his claim for restitution.

$961,880 for the businesses; additionally factoring in concerns that Uppal had understated other expenses such as payroll, Hackbart overpaid by $1,408,571.[5] Hackbart's counsel had earlier disclaimed any right to expenses or other consequential damages, including lost profits, occurring after the sale.[6]

Uppal presented his own expert, Ann Wilson, who criticized Bergmark's valuation approaches, including his calculation of net operating income. Using Bergmark's numbers as to Uppal's underpaid sales tax, Wilson obtained an adjusted net operating income figure of $243,090 and applied various multiples to conclude that as of May 2, 2005, the businesses were worth between $1,580,085 and $2,187,810. Wilson also looked at a valuation based on the businesses' income stream, reaching a valuation of $2,131,972. According to Wilson, the best evidence of fair market value (the price a willing buyer and seller would pay in an open market) was what actual price was paid,

---

[5] To get these numbers, Bergmark annualized existing information from January 2004 to August 2004 and took out the interest component to reach a net income number of $306,680. He divided the $306,680 into Hackbart's $1,875,000 purchase price to reach a multiple of 6.11, which was what Hackbart was willing to pay as a multiple of earnings. Bergmark then factored in the $157,328 that Uppal had underreported in sales taxes to ascertain the businesses' year-end earnings had the sales tax been included, and made the same calculations using the same 6.11 multiplier, to reach an indicated value of $913,120. He further adjusted the same numbers by $73,062 to reflect a 17 percent gross profit margin, which Bergmark estimated to be historically correct, and used the same 6.11 multiplier to get an indicated value of $466,429. From the latter calculation, Bergmark opined that Hackbart had overpaid $1,408,571 for the businesses ($1,875,000 minus $466,429). The jury awarded Hackbart $1,400,000 in fraud damages.

[6] Section 3343 allows recovery of not only out-of-pocket losses but also "additional damage" in the form of expenses or other consequential injury, including lost profits, resulting from the fraud. (§ 3343, subds. (1)-(4); *Bagdasarian v. Gragnon* (1948) 31 Cal.2d 744, 762-763.)

and Bergmark's numbers did not pass a "reality check" given Uppal had purchased the shuttered businesses for $1.1 million in 2001 with bankruptcy court approval.

Following the presentation of evidence, Bhanva and Soni successfully moved for a nonsuit on Hackbart's fraud causes of action. With the parties' agreement, the court thereafter instructed the jury on fraud damages as follows: "If you decide that the [plaintiffs] have proved their fraud claims—and that's what they are—against the defendant, you must also decide how much money would reasonably compensate the plaintiffs for the harm. This is called damages. [¶] The amount of damages must include an award for each item of harm that was caused by defendant's wrongful conduct, even if the particular harm could not have been anticipated. [¶] Plaintiffs do not have to prove the exact amount of damages that will provide reasonable compensation for the harm. However, you must not speculate or guess in awarding damages. [¶] The following are the specific items of damages claimed by the plaintiffs: [¶] One, overpayment for the business—or businesses; [¶] and prejudgment interest."[7]

---

[7] The trial court did not give CACI No. 1923 regarding out-of-pocket damages, which would have instructed the jury as to the measure of damages as follows: "To decide the amount of damages you must determine the [fair market] value of what [*name of plaintiff*] gave and subtract from that amount the [fair market] value of what [he/she/it] received. [¶] ['Fair market value' is the highest price that a willing buyer would have paid on the date of the transaction to a willing seller, assuming: [¶] 1. That there is no pressure on either one to buy or sell; and [¶] 2. That the buyer and seller know all the uses and purposes for which the [*insert item*] is reasonably capable of being used.]" (CACI No. 1923.) Uppal and Soni explain in their supplemental briefing that they did not request this instruction because they had stipulated that Hackbart would not be seeking damages other than out-of-pocket damages permitted under section 3343, i.e., moneys spent in reliance on fraud or lost profits. (See fn. 6, *ante*.)

11

The jury returned special verdicts in Hackbart's favor against Uppal, awarding Hackbart $1,400,000 in fraud damages, and, after considering additional evidence as to Uppal's finances, $700,000 in punitive damages.

The trial court then conducted a bench trial on Hackbart's claims for damages against MTPA, as well as his request for a finding of alter ego liability and remaining equitable cause of action against Uppal, Bhavna and Soni styled "unjust enrichment." It issued a proposed statement of decision, to which Hackbart and Soni objected and/or sought clarification. In its final statement of decision, the court (1) entered a default judgment against MTPA in the amount of $1,400,000; (2) found the evidence did not support a conclusion that recognition of the corporate form would work an injustice to Hackbart; and (3) found both Uppal and Soni were unjustly enriched: Uppal in the amount of the $155,000 bonus he had received at the close of the sale, and Soni in the amount of the $232,000 distribution he received at the close of sale. The court found the award against Uppal duplicative of the jury's fraud damage award, and required Hackbart to make an election before entry of judgment. It declined to impose liability on Bhavna, finding no evidence she participated in the business management or had awareness of its operations, but was merely a MTPA shareholder who relied upon her husband Uppal's conduct and direction. On the other hand, the court found Soni, a sophisticated businessman, was aware the business was being sold for more than it was worth and knew Hackbart was shown books and records that he considered to be unreliable, warranting a conclusion that it was unjust for Soni to realize the $232,000 return on his investment in MTPA.

12

On March 2, 2011, the court entered judgment in Hackbart's favor awarding $1,400,000 fraud and breach of contract damages against MTPA; $1,400,000 in fraud damages and $700,000 in punitive damages against Uppal; and $232,000 in unjust enrichment damages against Soni.

Uppal moved for judgment notwithstanding the verdict (JNOV) and for a new trial. He argued a new trial was warranted in part due to an error of law in that Hackbart had failed to establish a proper measure of damages, and also for excessive damages resulting from Hackbart's failure to present evidence of the businesses' actual value on the date of sale. He argued JNOV was proper for the latter failure of proof, as well as insufficient evidence of Hackbart's reasonable reliance. On April 15, 2011, the trial court denied both motions, as well as Soni's requests to join them. Thereafter, Uppal and Soni separately appealed from the March 2, 2011 judgment; Uppal identifying that portion of the judgment following the jury trial, and Soni identifying that portion of the judgment following the bench trial. Hackbart appeals the March 2, 2011 judgment both as to the jury and bench trials.

## DISCUSSION

### I. *Uppal's and Soni's Contentions*

A. *The Evidence is Sufficient To Support the Jury's Findings of Justifiable Reliance on Uppal's Fraud*

Uppal and Soni contend that based on the trial evidence, the jury could not reasonably have concluded that Hackbart acted with justifiable reliance on anything Uppal did or did not say concerning the Chevron station. They characterize Hackbart as

13

a "sophisticated buyer" with experience in the car wash industry, and point out, among other facts, Hackbart was never satisfied with the financial documents he had sought from Uppal and could not conduct an independent analysis to confirm the businesses' financials, but went ahead in any event with the purchase. Uppal and Soni argue that under the circumstances, the trial court should have granted Uppal's JNOV motion on this ground.

We asked the parties to brief Uppal and Soni's failure to identify the trial court's April 18, 2011 amended minute order denying JNOV in their notices of appeal. Having considered the supplemental briefing, we conclude neither preserved an appeal from that separately appealable order. (§ 904.1; *In re Baycol Cases I & II* (2011) 51 Cal.4th 751, 761, fn. 8 [if order is appealable, an appeal must be taken or the right to appellate review is forfeited]; see *Maughan v. Google Technology, Inc.* (2006) 143 Cal.App.4th 1242, 1247; *Sole Energy Co. v. Petrominerals Corp.* (2005) 128 Cal.App.4th 212, 239 [notice of appeal must identify the particular order being appealed].)

However, their contention on appeal as to the element of justifiable reliance is in substance a sufficiency of the evidence challenge, and because the jury resolved disputed facts in reaching its finding, on Uppal's and Soni's appeals from the March 2, 2011 judgment, we may review the record for substantial evidence. (*Winograd v. American Broadcasting Co.* (1998) 68 Cal.App.4th 624, 632; *Donovan v. Poway Unified School Dist.* (2008) 167 Cal.App.4th 567, 581-582.) A challenge to the sufficiency of the evidence to support a judgment may be made for the first time on appeal. (See, e.g., *Tahoe National Bank v. Phillips* (1971) 4 Cal.3d 11, 21, fn. 17.) " 'When a finding of fact

14

is attacked on the ground that there is not any substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether there is any substantial evidence contradicted or uncontradicted which will support the finding of fact.' [Citations] [¶] 'It is well established that a reviewing court starts with the presumption that the record contains evidence to sustain every finding of fact.' " (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881.) The statement relied upon by Uppal and Soni in *Sweatman v. Department of Veterans Affairs* (2001) 25 Cal.4th 62, 68—that a party moving for JNOV "may appeal from the judgment or from the order denying the motion for [JNOV], or both"—recognizes that a sufficiency of the evidence challenge may be asserted by either means.

      1. *Reasonable Reliance Element of Fraud*

In establishing fraud, including fraud by omission, Hackbart was required to prove actual, justifiable, reliance Uppal's on misrepresentations or omissions. Importantly, " ' "[i]t is not . . . necessary that [a plaintiff's] reliance upon the truth of the fraudulent misrepresentation be the sole or even the predominant or decisive factor in influencing his conduct. . . . It is enough that the representation has played a substantial part, and so has been a substantial factor, in influencing his decision." ' [Citations.] Regarding concealment claims, the plaintiff may establish this element by showing that 'had the omitted information been disclosed, [he or she] would have been aware of it and behaved differently.' " (*OCM Principal Opportunities Fund, L.P. v. CIBC World Markets Corp.* (2007) 157 Cal.App.4th 835, 864 (*OCM*).) Uppal and Soni do not challenge the evidence supporting the element of actual reliance, and Hackbart's testimony alone constitutes

15

substantial evidence he in fact relied on the financial information provided by Uppal, as well as Soni's failure to disclose his suspicions about the soundness of the businesses' financial operations. (*Major v. Western Home Ins. Co.* (2009) 169 Cal.App.4th 1197, 1208 [testimony of a single credible witness, even if a party, can be substantial evidence to support a judgment].)

To establish his reliance was justifiable, Hackbart must show the " 'circumstances were such to make it *reasonable* for [him] to accept [Uppal's] statements without an independent inquiry or investigation.' [Citation.] The reasonableness of the plaintiff's reliance is judged by reference to the plaintiff's knowledge and experience. [Citation.] ' "Except in the rare case where the undisputed facts leave no room for a reasonable difference of opinion, the question of whether a plaintiff's reliance is reasonable is a question of fact." ' " (*OCM*, *supra*, 157 Cal.App.4th at pp. 864-865; see *Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4th 1226, 1239; *Wilhelm v. Pray, Price, Williams & Russell* (1986) 186 Cal.App.3d 1324, 1332.) "Generally, '[a] plaintiff will be denied recovery only if his conduct is manifestly unreasonable in the light of his own intelligence or information. It must appear that he put faith in representations that were "preposterous" or "shown by facts within his observation to be so patently and obviously false that he must have closed his eyes to avoid discovery of the truth." [Citation.] Even in case of a mere negligent misrepresentation, a plaintiff is not barred unless his conduct, in the light of his own information and intelligence, is preposterous and irrational.' " (*OCM*, at p. 865; *Beckwith v. Dahl* (2012) 205 Cal.App.4th 1039, 1067.)

2. *Analysis*

We conclude the record contains substantial evidence to support the jury's finding that Hackbart reasonably relied on Uppal's misrepresentations and omissions. Contrary to Uppal's characterization of Hackbart as a sophisticated buyer, the evidence was that Hackbart, who had never been licensed as a CPA nor completed a master's degree in taxation, worked for approximately two years as an accountant, became a resort manager, installed cable television, worked as an administrator, and became an investment counselor with Bank of America. He purchased one business, a car wash, in 1998, with a partner. As Uppal acknowledges, Hackbart had never before purchased a business involving a gas station. The evidence does not support Uppal's characterization of Hackbart as a sophisticated purchaser of businesses.

The evidence shows Uppal, himself a CPA who had bought and sold multiple automotive oil change franchises, misrepresented to Hackbart the state of the station's financials, and concealed not only the 2003 break-even analysis reflecting significant losses, but also his underpayment of sales taxes. The jury found Uppal's misrepresentations were intentional. And, Hackbart made reasonable efforts to ascertain material financial information. During face-to-face meetings, Uppal showed Hackbart various profit and loss statements and spreadsheets with financial information, and Hackbart later pursued and carefully compiled net revenue numbers from information that Uppal broke down to him over the telephone. When Hackbart asked for more detailed back-up documentation, Uppal responded with a plausible excuse, telling

17

Hackbart the papers were out of his reach due to his CPA's recent move. Hackbart ultimately accepted Uppal's assurances that the numbers he provided were correct.

Uppal and Soni suggest that Hackbart's reliance was unjustified because Uppal was a stranger, and Hackbart should have conducted background checks, independently verified Uppal's profit and loss numbers, contacted a gas supplier, or hired consultants to assist him in evaluating the information provided by Uppal. However, "the law is clear that ' " '[n]o rogue should enjoy his ill-gotten plunder for the simple reason that his victim is by chance a fool.' " ' [Citation.] ' " 'Negligence on the part of the plaintiff in failing to discover the falsity of a statement is no defense when the misrepresentation was intentional rather than negligent.' [Citation.] 'Nor is a plaintiff held to the standard of precaution or of minimum knowledge of a hypothetical, reasonable man.' " ' " (*Beckwith v. Dahl*, *supra*, 205 Cal.App.4th at p. 1067; see also *Boeken v. Philip Morris, Inc.* (2005) 127 Cal.App.4th 1640, 1666-1667; *Hartong v. Partake, Inc.* (1968) 266 Cal.App.2d 942, 964-965.) And, any suspicions Hackbart may have had when Uppal denied his requests for additional information were "repeatedly deflected by plausible assertions of fact." (*Hartong v. Partake, Inc.*, at pp. 965-966.) "If the defendant makes a plausible explanation of fact, the plaintiff is not required to further investigate." (*Id*. at p. 966.)

The circumstances here are akin to those in *Hartong v. Partake, Inc.*, *supra*, 266 Cal.App.2d 942, in which plaintiffs without franchising experience sought help from defendants who held themselves out as expert consultants to potential franchisees and who used "confidence-inspiring" materials to induce trust. (*Id*. at pp. 949, 965.) The plaintiffs invested after being knowingly given false information by a supposed agent

18

concerning minimum net income based on past sales records, the nature and level of support they would receive, and information concerning the franchisor (*id*. at pp. 953-954, 957), but the performance was not as promised and the plaintiffs discovered that they had no actual business relationship with the franchisor, contrary to representations made to them. (*Id*. at pp. 953-954, 956.) The defendant argued the plaintiffs' reliance was unreasonable because they were negligent in failing to ascertain the extent of the agent's true authority, and had made some independent investigation of the facts. (*Id*. at p. 964.) The appellate court disagreed, pointing out the plaintiffs had no prior experience with franchising or distributorships, the defendant held itself out as an expert consultant and provided materials that backed its statements, and plaintiff's suspicions were allayed by defendant's plausible assertions as to the franchisor's relationships. (*Id*. at pp. 965-966.) Under these circumstances, the court concluded there was no bar to the plaintiffs' recovery by the fact some of them may have relied to some extent on independent advice or checked the company's Better Business Bureau rating. (*Id*. at p. 966.)

As in *Hartong*, the fact Hackbart conducted some investigation before the close of escrow does not preclude a finding of justifiable reliance. An independent investigation does not preclude reliance on representations where the falsity of statements is not apparent from an inspection, or the person making the representations has superior knowledge, or the party relying thereon is not competent to judge the facts without expert assistance. (*Bagdasarian v. Gragnon*, *supra*, 31 Cal.2d at p. 748; *Hartong v. Partake, Inc.*, *supra*, 266 Cal.App.2d at p. 966.) In view of Uppal's assertions of fact to Hackbart regarding the backup financial numbers, Hackbart was not required to conduct an

19

independent investigation.  (See *Linden Partners v. Wilshire Linden Associates* (1998) 62 Cal.App.4th 508, 529.)  Nor was Hackbart required to hire professionals to confirm the truth of Uppal's alleged representations, given Uppal's superior knowledge about the businesses' financial condition.  (See *Furla v. Jon Douglas Co.* (1998) 65 Cal.App.4th 1069, 1079 [buyer not required to hire a professional to discover falsity of seller's representations concerning area of real property]; *Hartong*, at p. 966; *Curran v. Heslop* (1953) 115 Cal.App.2d 476, 481-482 [reasonable reliance supported by the evidence even where buyer conducted physical inspection of house, where inspection did not reveal apparent building code violations].)

In sum, Hackbart made a reasonable effort to ascertain the financial information concerning the Chevron station and related businesses, received plausible assertions as to why Uppal could not provide backup financial information in the face of his requests, and he accepted at face value the balance sheets and spreadsheets given to him by Uppal, who had superior knowledge of the facts.  This is not a case in which Hackbart "put faith in representations that were 'preposterous' or 'shown by facts within his observation to be so patently and obviously false that he must have closed his eyes to avoid discovery of the truth.' "  (*OCM*, *supra*, 157 Cal.App.4th at pp. 864-865; see also *Cortez v. Weymouth* (1965) 235 Cal.App.2d 140, 151-152.)  His conduct, in the light of his own information and intelligence was not "preposterous and irrational."  (*Hartong v. Partake, Inc.*, *supra*, 266 Cal.App.2d at p. 965).  Substantial evidence supports the jury's finding that Hackbart justifiably relied on Uppal's misrepresentations and omissions.

B. *Claim of Failure of Proof of Out-of-Pocket Measure of Damages*

Uppal and Soni contend the trial court prejudicially abused its discretion by (1) allowing the jury to award damages contrary to the exclusive out-of-pocket measure of damages set forth in section 3343 for fraud "involving the 'purchase, sale or exchange of property'. . . ." and (2) preventing Uppal from fully presenting his own expert testimony on the businesses' actual value.[8] They maintain Hackbart did not put on evidence of the actual value of the gas station and car wash on the date of purchase and that Hackbart's expert Bergmark admitted as much when he testified that he based his damages calculation on Hackbart's desired "multiple of earnings." Uppal argues the failure of proof requires that judgment be entered in his favor on his JNOV motion. Soni argues the failure of proof on damages means there is no evidence to support the trial court's finding that Hackbart paid more for the businesses than what they were worth, and that he (Soni) was unjustly enriched.

Hackbart responds that the parties used the correct measure of damages at trial as evidenced in part by the jury instructions; that Uppal and Soni's challenge is merely to his expert's *methodology* in calculating value, which is an issue of credibility that cannot be

---

[8] We reject the latter contention out of hand, because the record shows that while the trial court initially sustained objections that would have limited Ann Wilson's opinion testimony, counsel for Hackbart then withdrew his objections, telling counsel for Uppal to "[a]sk [Wilson] whatever you want to ask." Though Uppal acknowledges counsel's withdrawal of the objection, he maintains he was "denied the opportunity to fully put on evidence of actual value for the gas station." Uppal does not, however, explain what additional evidence Wilson would have presented. Further, to the extent Soni purports to challenge the jury's fraud damage award as excessive, his failure to move for a new trial on that point bars the claim on appeal. (*Jamison v. Jamison* (2008) 164 Cal.App.4th 714, 719.)

21

relitigated in an appellate court. Hackbart asserts Bergmark's testimony showed the extent Hackbart overpaid for the businesses, satisfying section 3343, and it was countered by that of Uppal's expert, Wilson, who disagreed with Bergmark's conclusions and opined that a market-based approach was a more proper evaluation to determine the businesses' actual value. He points out it was the jury's task to weigh and evaluate the various expert approaches on how to best calculate the actual value of the gas station and car wash (the value of what he received) so that it could be compared with what Hackbart actually paid.

### 1. *Out-of-Pocket Measure of Damages*

One who is defrauded in the purchase or sale of property is entitled to recover the difference between the actual value of that with which the defrauded party parted and the actual value of that received. (§ 3343;[9] *Alliance Mortgage Co. v. Rothwell*, *supra*, 10 Cal.4th at p. 1240; *Bagdasarian v. Gragnon*, *supra*, 31 Cal.2d 744, 762; *Fragale v.*

---

[9]    Section 3343 provides in part: "(a)  One defrauded in the purchase, sale or exchange of property is entitled to recover the difference between the actual value of that with which the defrauded person parted and the actual value of that which he received, together with any additional damage arising from the particular transaction, including any of the following: [¶] (1) Amounts actually and reasonably expended in reliance upon the fraud. [¶] . . . [¶] (4) Where the defrauded party has been induced by reason of the fraud to purchase or otherwise acquire the property in question, an amount which will compensate him for any loss of profits or other gains which were reasonably anticipated and would have been earned by him from the use or sale of the property had it possessed the characteristics fraudulently attributed to it by the party committing the fraud . . . . [¶] . . . [¶] (b) Nothing in this section shall do either of the following: [¶] (1) Permit the defrauded person to recover any amount measured by the difference between the value of property as represented and the actual value thereof. [¶] (2) Deny to any person having a cause of action for fraud or deceit any legal or equitable remedies to which such person may be entitled."

*Faulkner* (2003) 110 Cal.App.4th 229, 236.)  The term value ordinarily means market value.  (*Bagdasarian*, at p. 753; *Colgan v. Leatherman Tool Group, Inc.* (2006) 135 Cal.App.4th 663, 675; *Glendale Fed. Sav. & Loan Assn. v. Marina View Heights Dev. Co.* (1977) 66 Cal.App.3d 101, 141.)  "The definition of market value and the principles governing its ascertainment are the same as those applicable to the valuation of property in eminent domain proceedings [citation] and in ad valorem taxation of property."  (*Glendale Fed.*, at p. 141.)

Market value " 'is normally determined by the price at which [property] could be resold in an open market or by private sale if its quality or other characteristics which affect its value were known.' "  (*Bagdasarian v. Gragnon*, *supra*, 31 Cal.2d at p. 753, quoting Rest., Torts, § 549, com. c; see also *In re Marriage of Hewitson* (1983) 142 Cal.App.3d 874, 882 (*Hewitson*) [fair market value is " 'the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell' and both having reasonable knowledge of relevant facts"].)  Damages are to be calculated as of the date of the transaction.  (*Salahutdin v. Valley of California, Inc.* (1994) 24 Cal.App.4th 555, 568; *McCue v. Bruce Enterprises, Inc.* (1964) 228 Cal.App.2d 21, 31.)  Hackbart had the burden to prove facts entitling him to damages in accordance with that measure.  (*Nece v. Bennett* (1963) 212 Cal.App.2d 494, 497.)

The out-of-pocket measure is contrasted with the benefit-of-the-bargain rule, which is " 'concerned with satisfying the expectancy interest of the defrauded plaintiff by putting him in the position he would have enjoyed if the false representation relied upon

had been true; it awards the difference in value between what the plaintiff actually received and what he was fraudulently led to believe he would receive.' " (*Alliance Mortgage Co. v. Rothwell*, *supra*, 10 Cal.4th at p. 1240; see 6 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 1710, p. 1238.)  In the case of a party defrauded in the purchase or sale of property, section 3343 specifically excludes benefit-of-the-bargain damages by prohibiting the defrauded person from recovering "any amount measured by the difference between the value of property as represented and the actual value thereof." (§ 3343, subd. (b)(1); *Fragale v. Faulkner*, *supra*, 110 Cal.App.4th at p. 236.)

2. *Invited Error*

Under the doctrine of invited error, if a party's conduct induces the commission of an error, the party is estopped from claiming on appeal that the judgment should be reversed because of that error.  (*Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 403; *Mary M. v. City of Los Angeles* (1991) 54 Cal.3d 202, 212.)  "As a leading treatise puts it, an appellant 'cannot complain of error [it] personally "invited."  In other words, one whose conduct induces or invites the commission of error by the trial court is *estopped* from asserting it as a ground for reversal on appeal.' " (*Transport Ins. Co. v. TIG Ins. Co.* (2012) 202 Cal.App.4th 984, 1000.)  The invited error doctrine applies with particular force in the area of jury instructions; a party that requests, or acquiesces in, a particular jury instruction cannot appeal the giving of that instruction or the sufficiency of evidence of matters contrary to the instruction.  (*Ibid*.; *Nevis v. Pacific Gas & Elec. Co.* (1954) 43 Cal.2d 626, 627-630 [defendant invited error in requesting jury instruction that a utilities company was permitted to maintain power lines a distance of 22 feet above the ground

and failing to request an instruction that an 18-foot minimum clearance was permitted in the subject accident area, which estopped defendant from arguing the evidence was insufficient to support a finding on negligence in respect to violating a 22-foot rule, or that the violation of that rule did not contribute to the plaintiff's injuries].)

Our request for supplemental briefing sought input from the parties as to whether Uppal and Soni had invited error on the measure of damages, including by failing to object to the trial court's fraud damages jury instruction or Bergmark's opinion testimony. Both Uppal and Soni concede they jointly proposed the damages instruction, asserting it "subsumed the requirements of Civil Code Section 3343" when it stated damages as "overpayment for the businesses." According to Uppal and Soni, they did not invite error by requesting the instruction because the reasonable and only construction of those terms means inclusion of the actual value (or fair market value) of the business on the date of sale. As for Bergmark's testimony, Uppal and Soni maintain they had no reason to object and they have not challenged its admission on appeal, because it was *favorable* to them in that he had no opinion as to valuation, a necessary element of the section 3343 measure of damages.

" ' " 'In a civil case, each of the parties must propose complete and comprehensive instructions in accordance with his theory of the litigation; if the parties do not do so, the court has no duty to instruct on its own motion.' [Citations.]" [Citation.] Neither a trial court nor a reviewing court in a civil action is obligated to seek out theories plaintiff might have advanced, or to articulate for him that which he has left unspoken.' " (*Metcalf v. County of San Joaquin* (2008) 42 Cal.4th 1121, 1130-1131.) And, with regard to the

25

measure of damages, "It is well established that where a case is tried, without objection on the part of the defendant, on the theory that a certain rule for the measure of damages is correct, the defendant cannot urge for the first time on appeal that the case was tried on an erroneous theory as to damages. [Citations.] Accordingly, the theory on which the case is tried, that under the issues framed certain damages are recoverable, will be adhered to by the appellate court on appeal." (*Evans v. Faught* (1965) 231 Cal.App.2d 698, 713-714.)

We conclude that under these principles, invited error bars Uppal's and Soni's contention that the trial court erred when it "allowed the jury to find damages . . . contrary to the express provisions of Civil Code section 3343" or "fail[ed] to apply" the proper measure of damages. (Emphasis and some capitalization omitted.) The record does not contain any motions in limine as to Bergmark's testimony and the parties do not point to any argument on Uppal or Soni's behalf to the court that it was somehow permitting the jury to award a legally incorrect measure of damage. Rather, the trial court instructed the jury in accordance with the parties' agreed-upon jury instruction, which unspecifically told the jury that Hackbart was entitled to damages in the form of his *overpayment* for the businesses. Each party presented experts who used different theories and methods to explain why Hackbart paid, or did not pay, more than what the businesses were worth. Even if this instruction "subsumed" the notion that the businesses' worth is to be determined by fair market value, as Uppal and Soni maintain, it was so general, lacking clarity, and incomplete that Uppal and Soni by offering it acceded to the jury's calculation of damages by any method the experts proposed to establish the

26

amount of Hackbart's overpayment. We cannot say the requested instruction was an incorrect statement of the law, but it was certainly vague and incomplete. Thus, Uppal and Soni should have sought additional or clarifying instructions in order to preserve a claim that the court erred by submitting an erroneous measure of damages to the jury or permitting the jury to reach an erroneous measure. (See, e.g., *Metcalf v. County of San Joaquin*, *supra*, 42 Cal.4th at pp. 1130-1131.)

We acknowledge Uppal moved for a new trial on grounds of excessive damages, as well as on grounds the verdict was "against law" or the result of an error in law. But principles of invited error nevertheless apply where a trial court, as here, has denied a motion for new trial. (*Hand Electronics, Inc. v. Snowline Joint Unified School Dist.* (1994) 21 Cal.App.4th 862, 870-871 [distinguishing application of invited error principles in connection with an order *granting* a new trial from an order *denying* a new trial; " ' ". . . the rules applicable to . . . invited error or to estoppel[] have no application when an appellate court is considering the propriety of an order granting a new trial. *If the trial court had denied the new trial such error would be considered waived by failure to object*" ' " (italics added)]; *Neal v. Montgomery Elevator Co.* (1992) 7 Cal.App.4th 1194, 1198; see *McCarty v. Department of Transportation* (2008) 164 Cal.App.4th 955, 984; contra, *Roberson v. J.C. Penney Co.* (1955) 136 Cal.App.2d 1, 4-5 [on appeal from an order granting a new trial, invited error by offering of jury instructions will not restrict appellate court from considering the issue].) And, to prevail on a motion for new trial on grounds of error in law, Uppal was required to have *excepted to* the error in the measure of damages. (Code Civ. Proc., § 657(7).) Nor is Uppal's claim saved by the fact he

27

moved for a new trial attacking the damages as a result of passion or prejudice, because in his motion, he "did not in so doing contend that the measure of damages upon which the jury was instructed was improper." (See *Easton v. Strassburger* (1984) 152 Cal.App.3d 90, 108, [appellate court rejected appellant's claim that the jury used the wrong measure in awarding damages even when appellant had moved for a new trial on grounds of damages being the result of passion or prejudice; the respondent and trial court relied in part on appellant's acquiescence in the use of the measure of damages, appellant did not object to the respondent's evidence regarding damages (cost of repair) and in fact offered its own evidence on this cost item, and in the absence of any objection by appellant to use of cost of repair as the proper measure, it would be unfair to allow the appellant to raise the issue].)

Based on these principles and the invited error doctrine, we conclude the trial court was not required to override the parties' choice of jury instructions and suggest a different measure of damages to the jury. Nor will we disturb the jury's compensatory fraud damages verdict, which was reached after a weighing of both parties' expert testimony and necessarily based on the measure of damages proposed by the parties.

II. *Uppal's Challenge to Punitive Damages Award*

Uppal advances a two-pronged argument against the jury's $700,000 punitive damages award. First, he maintains that because Hackbart failed to establish actual compensatory damages, he cannot be held responsible for punitive damages. Because we have not disturbed the jury's compensatory damages verdict, that contention fails. Uppal further contends the $700,000 award is contrary to law as it has no rational relationship to

his financial condition, namely the fact he is insolvent and there was no proof he had any net worth. Uppal summarizes his testimony at the punitive damages phase as indicating (1) he had no regular employment but acted as a consultant for various businesses; (2) he earned between $60,000 and $96,000 in 2010; (3) he did not own a business; (4) he owned a vehicle worth $10,000 and a home with no equity; (5) his 2009 tax return showed an adjusted gross income of $112,805.00; and (6) he had no real estate other than his heavily-encumbered home, no stocks or bonds, and no cash savings. He asks us to strike the punitive damages award.

Hackbart responds that Uppal's summary of the evidence is incomplete; that the record shows the jury relied on other financial condition information from expert Bergmark and also evidence of Uppal's access to loans from his mother and other family members, Uppal's ability to practice as a CPA, the existence of $100,000 cash in an escrow account, Uppal's $93,000 average yearly earning capacity, the $1,075,000 in cash Uppal received from the sale of the Chevron station, and Uppal's 2009[10] tax return, which reflected $266,800 in earnings.

A. *Legal Principles and Review Standards*

This court set out a comprehensive overview of punitive damages law in *Kelly v. Haag* (2006) 145 Cal.App.4th 910, 914-915: "An award of punitive damages hinges on three factors: the reprehensibility of the defendant's conduct; the reasonableness of the

---

[10] Hackbart describes this return in his brief as being from 2011, but the tax return Hackbart refers to is actually from 2009. Presumably Hackbart's reference to a 2011 tax return is a typographical error, as the punitive damages phase took place in December 2010.

29

relationship between the award and the plaintiff's harm; and, in view of the defendant's financial condition, the amount necessary to punish him or her and discourage future wrongful conduct." (*Id.* at pp. 914-915.) Under those standards, it was Hackbart's burden to present actual and meaningful evidence of Uppal's financial condition at the time of trial, net worth was not the only permissible evidence of ability to pay, and the evidence must be such that would permit the " 'jury and a reviewing court to determine whether the amount of the award is appropriate and, in particular, whether it is excessive in light of the central goal of deterrence.' " (*Id.* at pp. 915-916.) We are guided by the " ' "historically honored standard of reversing as excessive only those judgments which the entire record . . . indicates were rendered as a result of passion and prejudice." ' " (*Id.* at p. 916.) We review independently Uppal's challenge to the amount of the punitive damages award. (*Simon v. San Paolo U.S. Holding Co., Inc.* (2005) 35 Cal.4th 1159, 1172; *Major v. Western Home Ins. Co.* (2009) 169 Cal.App.4th 1197, 1222.)

B. *Analysis*

Here, Hackbart called Uppal to testify concerning his financial condition, and also presented Bergmark to testify about Uppal's ability to pay certain sums of money, given his income and ability to earn. The evidence showed Uppal's self-employment consulting income was generally in the range of $60,000 to $72,000 per year, however, his self-employment income reported to the IRS for 2009 was $266,800 (with $14,585 in expenses against income). Uppal also received $12,000 per year in rental income and obtained loans from his mother and other family members to pay other debts. Without objection, Bergmark testified that Uppal's yearly earnings given his education, age and

30

experience, and accounting for government and other benefits, were $93,632. Taking into account his life expectancy (Uppal was 50 years old at the time), the present value of Uppal's projected earnings was over $1.1 million. And, according to Bergmark, if Uppal continued to earn at the level his 2009 tax return indicated, he would be able to pay $3,152,261 in present value dollars. Bergmark did not look at Uppal's adjusted gross income, which was $112,805, because Uppal had closed the businesses from which he reported net operating losses. Bergmark admitted on cross-examination that he did not account for Uppal's expenses other than business expenses relating to his marketing or Uppal's cost of living. Nor did Bergmark take into account Uppal's income tax obligations to the state or federal government; he explained he only performed an earning capacity analysis.

On this record, we vacate the $700,000 punitive damages award in view of the absence of meaningful evidence of Uppal's actual wealth or ability to pay such a damages award. In *Kenly v. Ukegawa* (1993) 16 Cal.App.4th 49, this court expressly rejected the plaintiff's argument that the punitive damages award in that case could be based solely on the defendant's alleged profit: "An award based solely on the alleged 'profit' gained by the defendant, in the absence of evidence of net worth, raises the potential of its crippling or destroying the defendant, focusing as it does solely on the assets side of the balance sheet *without examining the liabilities side of the balance sheet.* Without evidence of the entire financial picture, an award based on 'profit' could leave a defendant devoid of assets with which to pay his other liabilities." (*Id.* at p. 57.) We made it clear that our

31

holding did not preclude such a showing in all cases, however, as long as there was some evidence to demonstrate that the defendant would not be crippled by the award. (*Id.* at p. 57, fn. 7.) In *Kelly v. Haag*, we held a $75,000 punitive damages award lacked evidentiary support where the plaintiff only produced evidence of the defendant's statements about certain properties and assets without evidence that he still owned them at the time of trial, and produced no evidence of the defendant's liabilities, requiring the trial court to speculate as to any liabilities. (*Kelly v. Haag*, *supra*, 145 Cal.App.4th at p. 917.)

The evidence here fails for the same reasons we expressed in the above cases. As stated, Hackbart bore the burden of proving Uppal's financial condition or ability to pay for purposes of the award (*Adams v. Murakami* (1991) 54 Cal.3d 105, 119; *Baxter v. Peterson* (2007) 150 Cal.App.4th 673, 680; *Kelly v. Haag*, *supra*, 145 Cal.App.4th at p. 916), which was required to be based on "some evidence of the defendant's actual wealth. Normally, evidence of liabilities should accompany evidence of assets, and evidence of expenses should accompany evidence of income." (*Baxter v. Peterson*, at p. 680.)

While the jury had before it evidence of Uppal's income, his earning capacity and the present value of his lifetime earnings, it had no meaningful evidence of Uppal's liabilities. Absent such evidence, the jury was unable to "assure that the award punishes but [would] not cripple or bankrupt [him]." (*Kenly v. Ukegawa*, *supra*, 16 Cal.App.4th at p. 57; see also *Baxter v. Peterson*, *supra*, 150 Cal.App.4th at p. 681 [though record showed the defendant owned substantial assets, it was silent with regard to her liabilities,

32

and thus insufficient for a reviewing court to evaluate her ability to pay $75,000 in punitive damages].)  Bergmark's testimony was limited to the present value of Uppal's earning capacity.

Hackbart suggests Uppal failed to produce adequate and timely financial condition evidence for the jury's evaluation.  However, the record indicates Uppal provided Hackbart's counsel with documents for the purpose of showing his financial condition for the punitive damages phase, and Hackbart does not demonstrate he was prevented from obtaining evidence of Uppal's net worth or that he lacked any meaningful resource to obtain evidence of Uppal's financial condition or net worth.  There is no indication Uppal failed to comply with court orders for such information, or that any void in financial condition information was attributable solely to Uppal.  (See *Mike Davidov Co. v. Issod* (2000) 78 Cal.App.4th 597, 608-609 [defendant waived any challenge to complain about the lack of evidence of net worth for purposes of punitive damages because he did not comply with a court order to produce his financial records]; *Caira v. Offner* (2005) 126 Cal.App.4th 12, 40-41 [trial court ordered defendant to produce a current financial statement; Court of Appeal held any insufficiency in the record as to his financial condition was attributable solely to defendant's failure to comply with a court order].)  Because Hackbart had a full and fair opportunity to present his case for punitive damages, we do not find any basis to remand the matter for retrial.  (See *Kelly v. Haag*, *supra*, 145 Cal.App.4th at p. 920.)

### III. *Restitution Award Against Soni*

Soni contends the trial court reversibly erred when it awarded Hackbart restitution on a theory of unjust enrichment. Pointing out he obtained a nonsuit on Hackbart's fraud causes of action, he maintains Hackbart's claims of unjust enrichment/restitution are not stand-alone causes of action but are merely duplicative of Hackbart's fraud claims as evidenced by the allegations of Hackbart's operative complaint, and thus there was no legal basis on which Hackbart could premise a theory of unjust enrichment. He argues that even if Hackbart could maintain a claim for unjust enrichment, there is no basis for a restitution award against him without evidence to support a finding that Hackbart suffered fraud damages from the sale.

Hackbart correctly concedes unjust enrichment is not an independent cause of action. (See *Levine v. Blue Shield of California* (2010) 189 Cal.App.4th 1117, 1138 [" ' "[T]here is no cause of action in California for unjust enrichment" ' "], quoting *Durell v. Sharp Healthcare* (2010) 183 Cal.App.4th 1350, 1370 (*Durell*), and see *Melchior v. New Line Productions, Inc.* (2003) 106 Cal.App.4th 779, 793 (*Melchior*).) He argues the evidence showed Uppal was acting on Soni's behalf, and that the predicate liability finding is the jury finding as to *Uppal's* fraudulent sale of the business, which, along with *First Nationwide Savings v. Perry* (1992) 11 Cal.App.4th 1657, provides the basis for the trial court's finding that Soni had been improperly benefitted and unjustly enriched. And,

34

according to Hackbart, section 2224,[11] relating to constructive trusts, sets out general principles that permitted the trial court to enter a restitutionary award against Soni in view of evidence that Soni knew of the businesses' precarious financial condition, acted "in close concert" with Uppal in the management and financing of the businesses, and urged Uppal to " 'do the minimum necessary' to market and sell them on his behalf, as quickly as possible."

Unjust enrichment is " ' "a general principle, underlying various legal doctrines and remedies," ' rather than a remedy itself." (*Melchior*, *supra*, 106 Cal.App.4th at p. 793.) It "is a common law obligation implied by law based on the equities of a particular case and not on any contractual obligation. [Citation.] Whether termed unjust enrichment, quasi-contract, or quantum meruit, the equitable remedy of restitution when unjust enrichment has occurred 'is an *obligation* (not a true contract [citation]) created by the law without regard to the intention of the parties, and is designed to restore the aggrieved party to his or her former position by return of the thing or its equivalent in money.' " (*F.D.I.C. v. Dintino* (2008) 167 Cal.App.4th 333, 346.) Unjust enrichment is synonymous with restitution, and has been characterized as describing the result of a failure to make restitution. (*Durell*, *supra*, 183 Cal.App.4th at p. 1370; *McBride v. Boughton* (2004) 123 Cal.App.4th 379, 387.)

---

11    Section 2224 provides: "One who gains a thing by fraud, accident, mistake, undue influence, the violation of a trust, or other wrongful act, is, unless he has some other and better right thereto, an involuntary trustee of the thing gained, for the benefit of the person who would otherwise have had it."

Likewise, restitution is itself not a cause of action, but a remedy. (*Munoz v*. *MacMillan* (2011) 195 Cal.App.4th 648, 661; *Nakash v. Sup. Ct.* (1987) 196 Cal.App.3d 59, 70.) " 'There are several potential bases for a cause of action seeking restitution. For example, restitution may be awarded in lieu of breach of contract damages when the parties had an express contract, but it was procured by fraud or is unenforceable or ineffective for some reason. [Citations.] Alternatively, restitution may be awarded where the defendant obtained a benefit from the plaintiff by fraud, duress, conversion, or similar conduct. In such cases, the plaintiff may choose not to sue in tort, but instead to seek restitution on a quasi-contract theory. . . . [Citations.] In such cases, where appropriate, the law will imply a contract (or rather, a quasi-contract), without regard to the parties' intent, in order to avoid unjust enrichment.' [¶] 'Under the law of restitution, "[a]n individual is required to make restitution if he or she is unjustly enriched at the expense of another. [Citations.] A person is enriched if the person receives a benefit at another's expense. [Citation.]" [Citation.] However, "[t]he fact that one person benefits another is not, by itself, sufficient to require restitution. The person receiving the benefit is required to make restitution only if the circumstances are such that, as between the two individuals, it is *unjust* for the person to retain it." ' " (*Durell*, *supra*, 183 Cal.App.4th at p. 1371, quoting *McBride v. Boughton*, *supra*, 123 Cal.App.4th at pp. 388-389.)[12]

---

[12]   We note too that "[a] party seeking restitution 'must generally return any benefit' that it has received." (*California Federal Bank v. Matreyek* (1992) 8 Cal.App.4th 125, 134, quoting Rest.2d, Contracts, § 376, com. a, § 384, com. a.)

Similarly, a constructive trust is an equitable remedy, not a substantive claim for relief. (*PCO, Inc. v. Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, LLP* (2007) 150 Cal.App.4th 384, 398.) It " 'is an involuntary equitable trust created by operation of law as a remedy to compel the transfer of property from the person wrongfully holding it to the rightful owner. [Citations.] The essence of the theory of constructive trust is to prevent unjust enrichment and to prevent a person from taking advantage of his or her own wrongdoing. [Citations.]' [Citations.] Before a constructive trust can be imposed, the plaintiff must prove that the defendant's acquisition of the property was *wrongful*." (*Ibid.*) A constructive trust may be imposed where the following three conditions are satisfied: " '(1) the existence of a *res* (property or some interest in property); (2) the *right* of a complaining party to that res; and (3) some *wrongful* acquisition or detention of the res by another party who is not entitled to it.' " (*Campbell v. Superior Court* (2005) 132 Cal.App.4th 904, 920.)

Here, Hackbart elected not to rescind the purchase agreement; as stated, he dismissed his rescission cause of action. Instead, he proceeded in tort on various fraud theories that permitted him to recover a tort measure of damages. Hackbart's operative complaint seeking unjust enrichment or restitution is based on allegations that Soni had defrauded him. The nonsuit on those fraud causes of action, which Hackbart does not challenge on appeal, constituted a judgment in Soni's favor on the merits (Code Civ. Proc., § 581c, subd. (c); *Fisch & Co. v. Superior Court* (1935) 6 Cal.App.2d 21, 23), and Soni ceased to be a party to the action as to those causes of action. There is no indication that Hackbart preserved his request for unjust enrichment against Soni by way of quasi-

contract cause of action or a common count to recover money or benefits obtained by fraud or other wrongdoing. (See, e.g., *F.D.I.C. v. Dintino*, *supra*, 167 Cal.App.4th at pp. 347-348 [holding three-year statute of limitations applies to unjust enrichment action "in the form of a common count to recover money or other benefit obtained by mistake"].)

We reject the proposition that, following the judgment of nonsuit on the sole causes of action asserted against him, any equitable obligation on Soni's part to return his share of the sales proceeds could somehow be found based on the jury's finding of *Uppal's* fraud. When it entered a nonsuit against Soni, the trial court necessarily found no evidence to support a finding that Soni committed or participated in Uppal's fraudulent representations or concealments under any theory, even assuming the truth of all the facts proved by Hackbart. (*Alpert v. Villa Romano Homeowners Assn.* (2000) 81 Cal.App.4th 1320, 1328.) No trier of fact found that Soni was liable for any wrongdoing, either as a principal or agent.

Hackbart's reliance on *First Nationwide Savings v. Perry* (1992) 11 Cal.App.4th 1657 does not assist him. In that case, involving a demurrer, the court held that "a transferee with knowledge of the circumstances giving rise to an unjust enrichment claim may be obligated to make restitution. For example, 'A person who has entered into a transaction with another under such circumstances that, because of a mistake, he would be entitled to restitution from the other, . . . [¶] . . . is entitled to restitution from a third person who had notice of the circumstances before giving value or before receiving title or a legal interest in the subject matter.' " (*Id.* at p. 1663, italics omitted.) In *First Nationwide*, the defendant against whom restitution was sought was the nonassuming

38

grantee of a purchase money deed of trust who sold property after a mistaken reconveyance by a trustee sued by the plaintiff beneficiary in the form of claims for "unjust enrichment" and money had and received. (*Id*. at p. 1660.) The Court of Appeal held the plaintiff should be permitted leave to amend to allege the defendant's knowledge of the trustee's mistaken reconveyance, and with such allegations could maintain a claim for unjust enrichment. (*Id*. at pp. 1669-1670.) Unlike *Perry*, there were no viable causes of action remaining against Soni. And, to the extent *Perry* can be read as recognizing a stand-alone cause of action for unjust enrichment, we decline to follow it.

Without a finding that Soni committed fraud or some other wrongdoing that would render it unjust for him to retain his benefit, it was not proper to enter a restitutionary award against him on the basis of theories of unjust enrichment or constructive trust. (Accord, *Borton v. Joslin* (1928) 88 Cal.App. 515, 522 [no constructive trust created where there is no evidence of facts (proof of fraud, accident, mistake, undue influence or any other wrongful act) that would justify a conclusion that a trust was created by operation of law].) We reverse the restitution award against Soni.

IV. *Hackbart's Cross-Appeal*

A. *Adequacy of Restitution Award*

Hackbart contends the trial court abused its discretion in its restitution award against Soni; that Soni received an actual benefit beyond the $232,000 in net cash proceeds from the sale of the business. According to Hackbart, the trial court should have calculated the restitutionary award as $560,000 based on Soni's 40 percent proportionate share of the $1,400,000 gross out-of-pocket damages awarded.

39

We have already reversed the restitution award against Soni as unsupported by an appropriate finding of wrongdoing sufficient to render it unjust for him to retain the sales proceeds. But Hackbart's contention is unavailing for another reason, namely, there is no indication in the record that Hackbart moved for a new trial on the ground of inadequate damages. "[F]ailure to timely move for a new trial ordinarily precludes a party from complaining on appeal that the damages awarded were either excessive or inadequate, whether the case was tried by a jury or by the court." (*Jamison v. Jamison* (2008) 164 Cal.App.4th 714, 719.)

B. *Alter Ego Liability*

In its statement of decision, the trial court declined to impose alter ego liability on either Soni or Bhavna. Emphasizing the doctrine was limited and invoked only "where recognition of the corporate form would work an injustice to a third person," it ruled the evidence did not support its application, reasoning: "Mr. Hackbart entered into the contract with MTPA knowing it to be a corporation. He received and continues to possess all of MTPA's known assets, and he had no reason to believe that he could rely on the financial responsibility of the individual shareholders." In a footnote, the court added: "Mr. Hackbart acknowledged that he did not rely on either Mrs. Uppal or Mr. Soni's representations in determining to enter into Exhibit [No.] 186."] It continued: "The individual conduct of Mr. Uppal and not the existence and/or continued maintenance of the corporate entity is the source of any injustice suffered by

40

Mr. Hackbart. Mr. Uppal is not the subject of this analysis as the record is clear that he was not a shareholder of MTPA."[13]

Hackbart contends the trial court committed an error of law by refusing to impose alter ego liability against Soni. Pointing to its focus on Hackbart's knowledge of MTPA's corporate status and the reasonableness of looking to the individual shareholders' financial responsibility, he maintains the court applied improper legal criteria, particularly in view of the evidence that MTPA was defunct as well as the court's findings that Uppal acted at all times on the corporation's behalf, Soni had substantial participation in the business's operations and financing, and Soni was aware Uppal had overvalued it for purposes of the sale. Hackbart argues this error "led [the court] astray, allowing a shareholder who both actively encouraged and benefitted from a fraud perpetrated on his behalf to misuse the corporate form to escape individual liability."

1. *Standard of Review*

Hackbart's challenge to the court's alter ego analysis and his claim the court did not apply correct legal criteria is assessed independently. (*Enrique M. v. Angelina V.* (2004) 121 Cal.App.4th 1371, 1378.) Even though our review is de novo, we nevertheless presume the judgment is correct and indulge all intendments and presumptions to support the ruling on matters as to which the record is silent. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.) And, "[t]he doctrine of implied findings requires the appellate court to infer the trial court made all factual findings necessary to

---

[13] Hackbart did not challenge the court's alter ego findings in his objections to its statement of decision.

support the judgment." (*Fladeboe v. American Isuzu Motors, Inc.* (2007) 150 Cal.App.4th 42, 58.) Hackbart's burden on appeal is not only to affirmatively demonstrate error on an adequate record (*Bianco v. California Highway Patrol* (1994) 24 Cal.App.4th 1113, 1125), but to show that the error caused a miscarriage of justice. (*Vaughn v. Jonas* (1948) 31 Cal.2d 586, 601; *In re Marriage of Dellaria* (2009) 172 Cal.App.4th 196, 204-205; Cal. Const., art. VI, § 13.) We will not presume prejudice from an error.

2. *Alter Ego Principles*

" '[A]lthough a corporation is usually regarded as an entity separate and distinct from its stockholders, both law and equity will, when necessary to circumvent fraud, protect the rights of third persons and accomplish justice, disregard this distinct existence and treat them as identical.' The issue is not so much whether, for all purposes, the corporation is the 'alter ego' of its stockholders or officers, nor whether the very purpose of the organization of the corporation was to defraud the individual who is now in court complaining, as it is an issue of whether in the particular case presented and for the purposes of such case justice and equity can best be accomplished and fraud and unfairness defeated by a disregard of the distinct entity of the corporate form.' " (*Kohn v. Kohn* (1950) 95 Cal.App.2d 708, 718; see *Mesler v. Bragg Management Co.* (1985) 39 Cal.3d 290, 300-301.) The doctrine is not itself a claim for substantive relief as a claim for breach of contract, rather, it is a procedural device by which courts disregard the corporate entity in order to hold the alter ego individual liable on the corporation's obligations. (*Leek v. Cooper* (2011) 194 Cal.App.4th 399, 418-419.)

42

"There is no litmus test to determine when the corporate veil will be pierced; rather the result will depend on the circumstances of each particular case. There are, nevertheless, two general requirements: '(1) that there be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist and (2) that, if the acts are treated as those of the corporation alone, an inequitable result will follow.' " (*Mesler v. Bragg Management Co.*, *supra*, 39 Cal.3d at p. 300.) "The essence of the . . . doctrine is that justice be done. 'What the formula comes down to, once shorn of verbiage about control, instrumentality, agency, and corporate entity, is that liability is imposed to reach an equitable result.' [Citation.] Thus the corporate form will be disregarded only in narrowly defined circumstances and only when the ends of justice so require." (*Id.* at p. 301; *Greenspan v. LADT LLC* (2010) 191 Cal.App.4th 486, 510-511.)

Because the alter ego doctrine is founded on equitable principles, a trial court must consider the totality of the circumstances and has broad latitude in determining whether the factual circumstances support the application of the doctrine. (See *Troyk v. Farmers Group, Inc.* (2009) 171 Cal.App.4th 1305, 1341-1342.) " ' "[T]he conditions under which a corporate entity may be disregarded vary according to the circumstances of each case." ' [Citations.] Whether the evidence has established that the corporate veil should be ignored is primarily a question of fact which should not be disturbed when supported by substantial evidence." (*Las Palmas Associates v. Las Palmas Center Associates* (1991) 235 Cal.App.3d 1220, 1248.) No single factor is determinative. (*Leek v. Cooper*,

43

*supra*, 194 Cal.App.4th at p. 418; *Zoran Corp. v. Chen* (2010) 185 Cal.App.4th 799, 812; *Troyk*, at p. 1342.)[14]

3. *Analysis*

The trial court began its alter ego analysis by quoting from *Mesler v. Bragg Management Co.*, *supra*, 39 Cal.3d 290 for the proposition that " 'the essence of the alter ego doctrine is that justice be done . . . [and] that liability is imposed to reach an equitable result.' "  It cited to the appellate court's statement in *Webber v. Inland Empire Investments, Inc.* (1999) 74 Cal.App.4th 884 that the doctrine is limited and only invoked " 'where recognition of the corporate form would work an injustice to a third person.' "

Given these comments, it is evident the trial court rightly focused on the justice or injustice flowing from recognition of MTPA's corporate form.  Importantly, Soni obtained a nonsuit on Hackbart's fraud claims; indeed as part of its alter ego analysis the trial court found Hackbart did not rely on any of Soni's statements in entering into the

---

14     Because the doctrine is equitable, its application " ' "is not made to depend upon prior decisions involving factual situations which appear to be similar . . . ." ' " (*Greenspan v. LADT, LLC*, *supra*, 191 Cal.App.4th at p. 512.)  Factors relevant to this analysis include "the disregard of legal formalities and the failure to maintain arm's length relationships among related entities," "the failure to maintain minutes or adequate corporate records," "the confusion of the records of the separate entities," the "failure to segregate funds of the separate entities," "[c]ommingling of funds and other assets," "the total absence of corporate assets and undercapitalization," the failure "to issue stock," "sole ownership of all of the stock in a corporation by one individual or the members of a family," overlapping officers and directors, "the use of the same office or business location," "the employment of the same employees and/or attorney," "the unauthorized diversion of corporate funds or assets to other than corporate uses," "the use of a corporation as a mere shell, instrumentality or conduit," and "the diversion of assets from a corporation by or to a stockholder." (*Associated Vendors, Inc. v. Oakland Meat Co.* (1962) 210 Cal.App.2d 825, 838-840.)

44

transaction. This precluded a finding that Soni intended to defraud Hackbart or used the corporate entity to perpetrate a fraud. Though the trial court did not make express findings on all of the factors recited above (fn. 13, *ante*) it had wide latitude (see *Troyk v. Farmers Group, Inc.*, *supra*, 171 Cal.App.4th at pp. 1341-1342) to assess *all* of the factual circumstances, not only those factors delineated by courts. As we have stated, the inquiry is fact-intenstive, and there is no single litmus test. (*Mesler v. Bragg Management Co.*, *supra*, 39 Cal.3d at p. 300.) We cannot say, based on the trial court's citation to relevant authorities and its focus on facts bearing on the equities of disregarding the corporate existence, it used erroneous legal standards in reaching its conclusion. At bottom, the doctrine "is an extreme remedy, sparingly used" (*Sonora Diamond Corp. v. Superior Court* (2000) 83 Cal.App.4th 523, 539) and "sound public policy dictates that imposition of alter ego liability be approached with caution." (*Las Palmas Associates v. Las Palmas Center Associates*, *supra*, 235 Cal.App.3d at p. 1249.) The doctrine "does not guard every unsatisfied creditor of a corporation but instead affords protection where some conduct amounting to bad faith makes it inequitable for the corporate owner to hide behind the corporate form. Difficulty in enforcing a judgment or collecting a debt does not satisfy this standard." (*Sonora Diamond Corp.*, at p. 539.)

Hackbart criticizes the court for failing to recognize evidence that Soni admitted no shares of MTPA were distributed, MTPA never held shareholder or director meetings, and Uppal and Soni abided by few corporate formalities. Mere failure to follow corporate formalities without inequity will not support application of the doctrine, however. Failure to issue stock is relevant, but not conclusive. (*Automotriz Del Golfo De California S.A. de C.V. v. Resnick* (1957) 47 Cal.2d 792, 796.) And, there was trial evidence that there was not a unity of interest (Uppal's and Soni's 60/40 ownership). Hackbart also argues his knowledge of MTPA's corporate status is not a reason to deny alter ego liability where "assets that purportedly belonged to a corporation remained in the name of individual shareholders while the corporation was in operation, and any assets actually held by the corporation were immediately stripped-out when the sale to Hackbart was complete, with no formal wind-out of the corporate entity after its sale." Hackbart provides no record citation that such evidence was presented in this case, and the trial court found otherwise, stating Hackbart "received and continues to possess all of MTPA's known assets . . . ." In any event, Hackbart does not challenge the sufficiency of the evidence of the court's findings, and we conclude there is no reason to disturb its ruling on Hackbart's claim of legal error.

46

DISPOSITION

That portion of the judgment awarding David Hackbart and Kihack Management, LLC $232,000 in restitution against Suresh K. Soni is reversed, as is the jury's $700,000 punitive damages award against Satinder M. Uppal.  The judgment is otherwise affirmed. The parties shall bear their own costs on appeal.

O'ROURKE, J.

WE CONCUR:

BENKE, Acting P. J.

IRION, J.